The right to worship God according to the dictates of one's conscience is the most cherished star in our constitutional constellation. Thus, civil government can overreach in few ways more egregious than by invoking the law to restrict a mother from teaching her child the worship of God. Yet, this is precisely what has occurred in this case by means of a lower court order. Consequently, I must vigorously dissent from the majority's refusal to overturn the offending portion of that order.
 I. Factual Background[11]
William and Laura Mashburn were divorced in May 1997, when their daughter was just five months old. By agreement, Laura was awarded custody of the child. She soon converted to a conservative Baptist denomination and, in 1999, married Brian Snider, who shared her new religious convictions. Benefiting from her new husband's provision, Laura chose to resign from her job and become a full-time homemaker in order to spend more time with her daughter, whom she homeschooled. Laura also assisted Brian in his work preparing video documentaries for a missionary ministry. As part of the child's homeschooling, the Sniders took her with them on trips abroad when they were filming documentaries. In December 2002, without objection by William, the Snider *Page 460 
family moved to the Indiana countryside to be closer to ministry headquarters.
Laura considered her duties as a parent to include the religious and moral instruction of her child, and she sought to follow Biblical standards in child-rearing. Laura tried to protect her daughter from worldly influences, including immoral TV shows and movies, and to have her dress in a feminine and modest way. Laura also followed the Bible by using corporal punishment to discipline the child when she misbehaved. Laura asked William to adhere to these standards during visitation and her father and stepmother to follow them when William left the child in their care.
Although William initially agreed to adhere to Laura's requests, he subsequently reneged on the agreement, drinking beer in front of the child on nearly a daily basis,[12] uttering profanity in her presence, and permitting her to watch TV shows and dress in clothing contrary to the standards he and Laura had agreed upon. William also left the child in day-care arrangements in which those agreed-upon standards were not followed.
Laura's father and stepmother likewise opposed Laura's religious convictions and child-rearing standards and refused to follow them. According to her father, Laura's requirements of long dresses and modest swimwear for her daughter were not "normal," so he and his wife disregarded them.[13] The maternal grandparents also disregarded Laura's instructions regarding the child's TV viewing. Laura's father justified his flouting of her instructions in these and other matters on the theory that grandparents have an independent right to make judgments about what is right for their grandchildren, provided they do not permit anything "objectionable to society as a norm."
The grandparents' efforts to impose what they regarded as society's norms were not limited to those occasions when the child was in their home. According to Laura, the grandparents "constantly berated" her for her conservative religious beliefs and attempted to pressure her into changing her practices in her own home.
A particular bone of contention was Laura's choice to personally oversee the education of her daughter by homeschooling her. Laura's stepmother, a state schoolteacher, believed that Laura was not qualified to teach her daughter "since [Laura] was not trained as a teacher" and was "not an education major." Although she conceded under examination that Laura is "very smart" and deserved some credit for educating the child well, Laura's stepmother claimed the child would "suffer" if the homeschooling were to continue.
Laura unsurprisingly regarded her father and stepmother's refusal to follow her instructions as an effort to "undermine" what she was trying to teach her daughter. Consequently, Laura took steps to preserve her authority and protect the child by limiting her visits to the maternal grandparents to times when she was accompanied. The grandparents resented their reduced access to the child, and they blamed Brian for Laura's conservative convictions. They also blamed Brian for the alienation resulting from their refusal *Page 461 
to conform to Laura's standards for her daughter.
As these disputes over which religious standards would be followed in rearing the child were ongoing, William petitioned the trial court for a change in custody. Recognizing the fundamental conflict between the religious views and practices of William, on the one hand, and the Sniders, on the other, the trial court asked during its own questioning of Brian, "Whose standard is to be applied?" The court also stated, "[T]here's no room for compromise. . . . Right?"
After the proceedings ended, the court issued its order. Not only did the court transfer custody of the child from Laura to William, but it also involved itself in the conflict of religious viewpoints by siding with William and ordering Laura to stop teaching her daughter the worship of God where such teaching would be critical "in any way" of William's more liberal religious views or practices:
 "[T]he religious training of the child while in the home of the Mother for visitation shall be made by example, and not by any religious training which would otherwise be disparaging or critical of in any way the beliefs of the Father, and/or the way in which his household is conducted."
The trial court justified this sweeping directive solely on the ground that it would prevent the child from feeling "unnecessarily confuse[d] or pressurize[d] [sic]" by the differences in her parents' religious views and practices.
Although Laura appealed to the Court of Civil Appeals, it affirmed the trial court's judgment without an opinion. Sniderv. Mashburn (No. 2030202, Oct. 15, 2004), 921 So.2d 478
(Ala.Civ.App. 2004) (table). Laura then petitioned this Court for a writ of certiorari and requested reversal of both the transfer of custody and the directive restricting her right to train her daughter in the worship of God. Although this Court initially granted Laura's petition, the majority today quashes that writ without addressing the merits of Laura's claim that her rights were infringed and without explaining why that claim may not be addressed.
 II. The trial court's order restricts Laura's right to teach her child the worship of God.
The majority's refusal to consider the merits of Laura's claim is very troubling, as Laura implicates the trial court in the infringement of two closely connected, God-given and inalienable rights — the right to free exercise of religion and the right to freedom of expression in the training of one's children:
 "[T]he trial court exceeded its authority by restricting the Mother by only permitting her to train the child in her religious views `by example.' The mother should be free to explain the teachings of her church to the child and to continue to foster her child's development as a Christian."
(Petitioner's brief, pp. 38-39.) Given the exceptional importance of these rights, I believe this Court has a duty to fully consider the claims of the infringement of these rights now rather than inviting the parties to restart the potentially lengthy and costly litigation process all over again, as the majority opinion directs.
Unfortunately, rather than address the vital substance of Laura's concern, the majority ignores it and instead criticizes the form in which she expressed that concern by suggesting that Laura has interpreted the trial court's order more broadly than the court intended. 929 So.2d at 457. It is true that Laura's restatement of the trial court's order could have been more precise — just as the language of the trial court's order could have been more precise *Page 462 
— but I do not find Laura's characterization of the order to be inaccurate when considered in context. Moreover, even the most deferential reading of the trial court's order fails to address what I consider to be the most important issue in this case: whether the trial court overreached by ordering Laura to stop teaching her child the worship of God to the extent that such teaching conflicted with William's beliefs or practices.[14]
 III. This Court may consider Laura's claim that her religious liberties were infringed by the trial court's order.
Ordinarily, on a petition for a writ of certiorari, this Court limits its review to the issues raised in the petition. Ex parteBland, 796 So.2d 340, 343 (Ala. 2000). However, we have long held that in child-custody proceedings, equitable considerations trump procedural technicalities. As Justice Smith — joined by Chief Justice Nabers, Justice Stuart, and Justice Bolin — wrote earlier this year, where the custody of children is at issue, "this Court `will not be governed by legal niceties in pleading.'" Ex parte G.C., 924 So.2d 651, 665 (Ala. 2005) (Smith, J., concurring specially) (quoting Evans v. Evans,264 Ala. 2, 6, 84 So.2d 337, 340 (1955)). In fact, it is "well settled" in Alabama that "in proceedings involving the custody of children," a court "is not bound by any strict rules of pleading or procedure." Hardy v. Hardy, 250 Ala. 297, 299,34 So.2d 212, 213 (1948) (emphasis added). *Page 463 
In the instant case, although Laura failed to explicitly raise the issue of the trial court's infringement of her religious rights in her petition for the writ of certiorari, she did explicitly raise the issue in her supporting brief, which was submitted to this Court bound with her petition as one document. Consequently, I consider Laura's procedural error to be one this Court may overlook as a failure to comply with a "legal nicety" unless doing so would violate William's due-process rights.
Under the circumstances, the only due-process right I can imagine could possibly be infringed is William's right to receive adequate opportunity to respond to the issue raised. Because William did receive notice of the issue in Laura's supporting brief and responded to it in his reply brief, it is evident that William did have adequate opportunity to respond. Thus, his due-process rights would not be violated by our overlooking Laura's procedural error. Consequently, I find no procedural obstacle to this Court's considering the merits of Laura's claim.
The majority opinion also appears to have found no obstacle to considering the merits of Laura's claim. In fact, the majority opinion declines to challenge the applicability of the standards of Evans and Hardy to this case. Nevertheless, rather than deciding the issue before us, the majority opinion avoids the issue by inviting Laura to begin the litigation process all over again at the trial level. According to the majority opinion, this is "the appropriate vehicle" for her to seek justice in the courts because it would allow full development of "these important issues." 929 So.2d at 458-59.
To be sure, the vehicle advanced by the majority is one
possible vehicle for Laura under the precedent of Ex parteLipscomb, 660 So.2d 986 (Ala. 1994), cited by the majority, but it is not, as the majority opinion suggests, the only
appropriate vehicle. In fact, the procedural delay caused by the option suggested by the majority opinion is inadvisable, not only because it undermines the administration of justice by inviting additional litigation but also because it needlessly burdens both parties by forcing them to devote further time and to incur additional legal costs in a matter this Court could easily address today. Most importantly, the majority's approach contravenes the best interests of the child, who might have to wait literally years for the courts to complete reconsideration of the issues.
I am therefore completely unconvinced by the rationale offered by the majority opinion for excusing this Court's prompt consideration of what it admits are "important" issues. Because of this, I would consider these issues without further delay. I do so below, first by providing the historical understanding and context of American recognition of the right to worship God and, second, by evaluating the trial court's order under the Alabama Constitution today.
 IV. The right to worship God is an inalienable, God-given right recognized by the Founders of the United States.
For innumerable Americans and Alabamians, from the founding of this Nation to the present, the worship of God and faith in His providence have provided hope for a blessed life on earth and salvation in eternity.
Recognizing faith in God as the bulwark of our freedom, the Founders deliberately grounded American independence on the "Laws of Nature and of Nature's God." See Declaration ofIndependence. In this regard, Jefferson asked: *Page 464 
 "Can the liberties of a nation be thought secure when we have removed their only firm basis, a conviction in the minds of the people that these liberties are the gift of God? That they are not to be violated but with His wrath?"
Thomas Jefferson, Notes on the State of Virginia, 1782, in Andrew M. Allison, M. Richard Maxfield, K. DeLynn Cook, and W. Cleon Skousen, The Real Thomas Jefferson 523 (National Center for Constitutional Studies, Washington, D.C., 2d ed. 1983). In his second inaugural address, Jefferson elaborated further on the necessity of reliance on God as the Author and Preserver of our liberties and blessings:
 "I shall need . . . the favor of that Being in whose hands we are, who led our forefathers, as Israel of old, from their native land, and planted them in a country flowing with all the necessaries and comforts of life; who has covered our infancy with His providence, and our riper years with His wisdom and power; and to whose goodness I ask you to join with me in supplications, that He will so enlighten the minds of your servants, guide their councils, and prosper their measures, that whatsoever they do shall result in your good, and shall secure to you the peace, friendship, and approbation of all nations."
Thomas Jefferson, Second Inaugural Address, 1805; quoted in Allison, 403-04.
The Framers of the United States Constitution rightly perceived that the worship of God includes both a corporate and an individual dimension. In the darkest days of the Constitutional Convention, with delegates strongly divided, Benjamin Franklin brought them together by an appeal to the corporate dimension of worship, reminding those gathered of God's role in the formation and preservation of this Nation:
 "In the beginning of the contest with Britain, when we were sensible of danger, we had daily prayers in this room for the divine protection. Our prayers, Sir, were heard — and they were graciously answered. . . .
 "I have lived, Sir, a long time; and the longer I live, the more convincing proofs I see of this truth, that God governs in the affairs of men. And if a sparrow cannot fall to the ground without his notice, is it probable that an empire can rise without his aid? We have been assured, Sir, in the sacred writings that `except the Lord build the house, they labor in vain that build it.' [Psalm 127:1]. I firmly believe this; and I also believe that, without his concurring aid, we shall succeed in this political building no better than the builders of Babel. . . ."
Benjamin Franklin, June 28, 1787, in James Madison, Notes ofDebates in the Federal Convention of 1787 209-210 (Ohio University Press, 2d prntg. 1985).
George Washington also recognized the importance of corporate worship in 1796 when he emphasized that "Religion and Morality are the essential pillars of civil society." Ashbel Green, TheLife of Ashbel Green, by Himself 615 (1849). Washington further recognized that the irreducible core of religious liberty is the individual's right to worship God:
 "The liberty enjoyed by the people of these States, of worshipping Almighty God agreeably to their consciences, is not only among the choicest of their blessings, but also of their rights."
Paul F. Boller, Jr., George Washington and Religion 179-80 (Southern Methodist University Press, 1963).
James Madison, a key delegate to the Constitutional Convention and a primary author of the Bill of Rights, also recognized and emphasized the individual right *Page 465 
and duty to worship God. In his 1785 "Memorial and Remonstrance Against Religious Assessments," Madison stated:
 "The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these [reason and conviction] may dictate. This right is in its nature an unalienable right. . . . It is the duty of every man to render to the Creator such homage, and such only, as he believes to be acceptable to him."
Madison further stated:
 "This duty is precedent both in order of time and degree of obligation, to the claims of Civil Society. Before any man can be considered as a member of Civil Society, he must be considered as a subject of the Governor of the Universe: And if a member of Civil Society, who enters into any subordinate Association, must always do it with a reservation of his duty to the general authority; much more must every man who becomes a member of any particular Civil Society, do it with a saving of his allegiance to the Universal Sovereign."
Norman Cousins, "In God We Trust": The Religious Beliefs andIdeas of the American Founding Fathers 308-14 (Harper Bros., 1958).
Given that the Founders of our Nation regarded the right to worship God both corporately and individually as the core of religious liberty, it is no surprise that they placed it at the very beginning of the First Amendment to the Bill of Rights. It therefore stands to reason that they would have regarded any law or court order prohibiting a person from worshipping God as the very epitome of tyranny and would have been shocked by a court order prohibiting a parent from teaching the worship of God to her child.
Indeed, no aspect of religious freedom is more treasured than the right of parents to teach their children to worship God, which right has been recognized by the United States Supreme Court. See Pierce v. Society of Sisters, 268 U.S. 510, 535,45 S.Ct. 571, 69 L.Ed. 1070 (1925) ("The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."), and Wisconsin v.Yoder, 406 U.S. 205, 213-14, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) ("[T]he values of parental direction of the religious upbringing and education of their children in their early and formative years have a high place in our society. . . .").
The religious instruction of children is important not only for society generally, but also particularly for parents who believe, as does Laura, that the worship of God through faith in Jesus Christ is the only way of salvation and that God Himself has commanded parents to teach His commands to their children:
"Hear, O Israel: The Lord our God, the Lord is one.
 "You shall love the Lord your God with all your heart and with all your soul and with all your might.
 "And these words that I command you today shall be on your heart.
 "And you shall teach them diligently to your children, and shall talk of them when you sit in your house, and when you walk by the way, and when you lie down, and when you rise."
Deuteronomy 6:4-7.
Given the unique importance of fundamental religious rights — particularly where they overlap fundamental rights of free speech — courts should act with the highest caution when considering an order restricting the exercise of these rights. Regrettably, this level of caution appears *Page 466 
to have been sorely lacking in paragraph 3(j) of the trial court's order.
 V. The Alabama Constitution recognizes the inalienable right to worship God and to freely express that worship of God.
The Alabama Constitution provides clear recognition of the inalienable right to worship God. The Alabama Religious Freedom Amendment, Amend. No. 622 to § 3, Ala. Const. 1901, provides in the relevant part of Section V:
 "(b) Government may burden a person's freedom of religion only if it demonstrates that application of the burden to the person:
 "(1) Is in furtherance of a compelling governmental interest; and
 "(2) Is the least restrictive means of furthering that compelling interest."
Paragraph 3 of section IV defines "Government," in part, as "[a]ny branch . . . instrumentality, [or] official . . . of the State of Alabama." Because the Alabama judicial system is a branch of civil government, the trial court's order is subject to this Amendment, which was designed to function as a strong wall protecting Alabamians' free exercise of religion from state interference.[15]
The Alabama Constitution likewise provides strong support of Alabamians' God-given freedom of expression. Article I, § 4, of the Constitution of Alabama of 1901 provides:
 "[N]o law shall ever be passed to curtail or restrain the liberty of speech or of the press; and any person may speak, write, and publish his sentiments on all subjects. . . ."
Even if a type of speech is not protected by a single constitutional provision, however, it will still receive the highest protection where it overlaps another right recognized by the Constitution. In the instant case, the expression restricted by the trial court is religious speech, which involves overlapping free-exercise and free-expression rights. Thus, that part of the trial court's order is subject to the Religious Freedom Amendment to the Alabama Constitution, which requires the court to demonstrate that its order furthers "a compelling [civil] governmental interest" by "the least restrictive means."
 VI. The trial court's order violates the Constitution of Alabama by impermissibly infringing on Laura's inalienable rights.
As I state in Part I of this dissenting opinion, the only interest offered by the trial court to justify stripping Laura of her fundamental right to teach her child the worship of God is that doing so will prevent the daughter from feeling "unnecessarily confuse[d] or pressurize[d] [sic]" because of the differences in her parents' religious views and practices. I find such a rationale to be thoroughly unpersuasive.
I can find no precedent in law and no foundation in reason to support the notion that an attempt to ensure the protection of *Page 467 
a child from pressure and confusion resulting from differences of opinion between parents falls within the jurisdiction of the state.[16] Even if, through exceptional circumstances, the state could acquire such jurisdiction, preventing a child's "unnecessary" feelings of pressure or confusion would hardly rise to the level of a "compelling [civil] government interest" as required by the Alabama Constitution to justify state interference with the God-given religious freedom of its citizens.
But even if, arguendo, one could contrive a "compelling state interest" in a child's not feeling unnecessarily pressured or confused — and justify the right of the civil government to enter the sphere of family government to ameliorate those feelings in a child — the means to that end as chosen by the trial court in the instant case is far from the "least restrictive means" required by the Alabama Religious Freedom Amendment.
In fact, the final part of paragraph 3(j) of the trial court's order constitutes nothing less than a blanket prohibition on Laura's right to speak to her child about certain core principles of her conservative Christian faith — including absolute standards of right and wrong and absolute beliefs about the afterlife — merely because her former husband does not share these core principles.
The trial court's order even prevents Laura from answering
theological questions posed by her daughter whenever Laura's honest answer would reveal conflicts with the views or practices of the father. Given the mutually exclusive viewpoints of Laura and her former husband, the trial court's order ultimately forces Laura to choose between forgoing her free-exercise and free-expression rights or forgoing her right to visitation with her child. Such a result is hardly the least restrictive means by which to meet the trial court's announced end.
In addition, the trial court's use of the passive voice ("[T]he religious training of the child . . . shall be made by example. . . .") makes the order so broad that it would apply to Laura's husband Brian (and anyone else visiting in the Snider home). This is highly troubling, because Brian was not a party to the case and his free-exercise and free-expression rights are also entitled to protection under the Alabama Constitution. This overly broad aspect of the trial court's order is yet another way in which it is not the least restrictive means to its announced end.
It would not have been difficult for the trial court to modify its order slightly to come as close as possible to achieving its announced end without violating Laura's fundamental rights recognized by the Alabama Constitution. Instead of issuing a blanket "gag" order against Laura's uttering any religious teaching that might be contrary to William's religious views or practices, the trial court could have ordered Laura to qualify
every such comment with a statement to the following effect: "This is what Mommy believes from the Bible, but Daddy believes something different. Sometimes parents disagree." Such an order would acknowledge real differences of opinion between parents without favoring one denominational viewpoint over another.
To be sure, the child would be left with some confusion as a result of the approach I propose. But whatever confusion this approach would cause is likely to be less than the confusion resulting from Laura's *Page 468 
trying to explain why she is completely prohibited from answering many of her daughter's basic questions about God. If Laura were to respond to her daughter with, "The judge may punish me if I answer you," or "If I answer you, honey, you may not be able to see Mommy again," or some other, similar answer, the child would be more confused than if her mother could answer sincerely according to her beliefs and merely add the comment that some people, including Daddy, do not believe the same thing.
Even if, upon further review, my suggested modification of the order is found wanting, I have no doubt that, upon this Court's direction, the trial court could easily identify other language that accomplishes the least restrictive means required under the Alabama Constitution.
To view the issue from another perspective: If the Alabama Legislature had passed a bill restricting parental rights in the same manner as does the trial court's order, this Court would not hesitate to strike it down as unconstitutionally vague, overbroad, and violative of fundamental rights. We should be no less vigilant to correct unconstitutional actions in our own branch of civil government.
Consequently, rather than quashing the writ of certiorari, this Court should sustain the writ for the purpose of reversing the final part of paragraph 3(j) of the trial court's order and remand the case for the trial court to issue a new order consistent with the Alabama Constitution.
[11] The majority opinion objects to my statement of the facts not because it is untrue but because the majority believes it reflects a view of the evidence "most favorabl[e] to Laura." According to the majority, my account of the facts is "not appropriate" because it does not reflect a due deference to the trial court's perspective on "`disputed evidence in ore tenus proceedings.'" 929 So.2d at 451 (quoting Ex parte Pielach,681 So.2d 154, 155 (Ala. 1996)). If the facts as I recount them weredisputed and I only restated Laura's account, my statement would indeed fall short of the standard cited by the majority opinion; however, because the facts I recount were not disputed (indeed, many of them were taken directly from the testimony of witnesses supplied by William, the party favored by the trial court), the majority's objection is misplaced.
[12] In an effort to disguise from the court the quantity of beer he consumed, William altered his check register by whiting out references to the purchase of beer and, in one entry, wrote "root" in a different ink color in front of the word "beer."
[13] The stepmother also claimed that disregarding Laura's standard for swimwear was necessary for safety reasons, stating that she bought alternative swim attire to "make sure [the child] doesn't drown because her clothes are falling off her."
[14] The majority opinion contends that I read the trial court's order "too broadly" because "[n]othing" in it "prevents Laura from teaching the child every facet of the Christian faith and every principle and lesson contained in the Bible."929 So.2d at 457 (emphasis added). According to the main opinion, "any parent" can teach the whole counsel of God to a child "without disparaging . . . [a] former spouse." 929 So.2d at 457.
Of course, the contention of the majority cannot be true, because holding firmly and consistently to one interpretation of the Bible (or any book, for that matter) logically precludes other, contradictory interpretations. Where the contradiction is between the understanding of one spouse and the practices of another, to teach the understanding of the one is necessarily to disparage the practices of the other.
For example, if one parent is a Christian and the other is a witch, the Christian parent could not teach that the Bible condemns witchcraft as an "abomination" (see, e.g., Deuteronomy
18:10: "There shall not be found among you anyone who burns his son or daughter as an offering, anyone who practices divination or tells fortunes or interprets omens, or a sorcerer or a charmer or a medium or a wizard or a necromancer, for whoever does these things is an abomination to the LORD.") without implicitly disparaging the parent who practices witchcraft.
Furthermore, if the child asked explicitly if the pagan parent was doomed to Hell for practicing witchcraft, the Christian parent would have to choose between teaching what the Bible says (see, e.g., Galatians 5:19-21, which teaches that those who practice witchcraft, among other things, will not go to Heaven) and obeying the court order to refrain from a teaching that would in any way be disparaging of the beliefs of the other parent.
Something very similar occurred in the instant case, in which the child asked her mother if William was going to Hell and, based on her understanding of the Bible and her knowledge of William's beliefs, Laura said "Yes." Such a reply may sound harsh to those who favor a more liberal or universalist view of salvation (certainly the trial court considered it harsh), but it is outside the proper jurisdiction of a state court in Alabama to prohibit such an utterance by favoring the denominational view of one parent over that of the other.
To take sides in this manner, as the trial court did, is no less than state endorsement of a particular religious denomination. This is impermissible in Alabama, in which the people have declined to establish a particular denomination as the official state religion.
[15] In fact, Alabama's constitutional protection of the right to worship God was designed to be stronger than that of the Constitution of the United States as interpreted by the United States Supreme Court. In response to, among other cases, Boernev. Flores, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), which struck down the federal Religious Freedom Restoration Act, Alabamians showed that our state motto — "We dare defend our rights" — is no mere slogan by ratifying the Alabama Religious Freedom Amendment in 1999.
[16] See Ex parte G.C., 924 So.2d at 674 (Parker, J., dissenting), for an overview of the different government jurisdictions — the individual, the family, the church, and the state — established by God.