THOMAS, Judge.
T.T.T. (“the father”) appeals from the judgment of the Baldwin Juvenile Court finding that he voluntarily relinquished custody of T.R.T. (“the child”) and awarding sole legal and physical custody of the eight-year-old child to R.H. (“the maternal grandmother”) and J.R.H. (“the maternal grandfather”), subject to visitation by the father. The father also appeals the juvenile court’s award of child support to the maternal grandparents. We affirm the juvenile court’s judgment awarding custody to the maternal grandparents. We reverse the judgment awarding the maternal grandparents child support and remand the cause to the juvenile court so that it may properly apply Rule 32, Ala. R. Jud. Admin.
The father and T.H.T.D. (“the mother”) divorced in June 2000, when the child was approximately seven months old. The June 2000 divorce judgment incorporating an agreement of the parents awarded to the mother sole custody of the child, subject to the father’s graduated, scheduled, and supervised visitation. For the most part, the father seldom exercised visitation with the child.[1] On May 2, 2007, the mother died from a drug overdose.[2]
On May 11, 2007, the maternal grandparents, acting pro se, filed a dependency petition alleging that the child, who had been left in their care for several years by the mother, was dependent and in need of care and supervision because the child had no parent or guardian able to provide for her support, training, and education. The dependency petition identified T.T.T. as the child’s father but alleged that his address was unknown.
Although the record is unclear as to when it occurred, the juvenile court apparently ordered the maternal grandparents to locate and serve the father. The maternal grandmother testified that her daughter, the maternal aunt, used the Internet and eventually located the father’s sister, who, in turn, contacted the father. The father then contacted the maternal grandparents and learned of the mother’s death and that the child was and had been living with the maternal grandparents for several years.
After filing the dependency petition pro se, the maternal grandparents retained an attorney and filed a “Petition for Temporary and Permanent Custody” in the juvenile court on August 17, 2007. That same *547 day, the juvenile court entered a pendente lite order awarding the maternal grandparents temporary, sole legal and physical custody of the child. The action initiated by the maternal grandparents’ pleadings was assigned case number JU-00-42.02.
On August 29, 2007, the father filed an answer denying the maternal grandparents’ allegations. The father also filed a counterclaim seeking custody of the child and a motion for visitation with the child. The action initiated by the father’s pleading was assigned case number JU-00-42.03.
On September 7, 2007, the juvenile court held a hearing. The juvenile court consolidated case numbers JU-00-42.02 and JU-00-42.03 upon the joint motion of the parties. The juvenile court heard disputed, oral testimony from the father and the maternal grandmother. On September 12, 2007, the juvenile court entered an “Order on Temporary Issues” finding that “the circumstances involved in this matter do not amount to an emergency situation!;] however, the Court believes that the status quo will be in the best interest of the child. Therefore, the Petitioners, [the maternal grandparents], shall maintain temporary legal and physical custody of the child until further order of the court.” The juvenile court awarded visitation to the father.
On October 24, 2007, the juvenile court held a healing at which it heard disputed, oral testimony from the father, the maternal grandmother, the maternal aunt, a licensed professional counselor specializing in the assessment and treatment of children, the principal of the child’s school, and a neighbor to the maternal grandparents.
On October 31, 2007, the juvenile court entered a judgment that, among other things, found that the father had voluntarily relinquished his right to custody of the child and awarded to the maternal grandparents sole legal and physical custody of the child subject to the father’s telephonic and in-person visitation. That judgment also ordered the father to pay child support to the maternal grandparents. The order outlined in very specific detail the liberal visitation awarded to the father.
On October 30, 2007, before the juvenile court’s judgment was entered, the father filed a postjudgment motion challenging the juvenile court’s finding that he had voluntarily relinquished his right to custody of the child. On November 9, 2007, the father timely appealed.

Jurisdiction

Although neither party on appeal has raised the issue of jurisdiction before this court, jurisdictional matters are of such significance that the court may raise them ex mero motu. Heaston v. Nabors, 889 So.2d 588, 590 (Ala.Civ.App.2004).
The father’s postjudgment motion sought relief from a judgment that was not yet final because the motion was filed one day before the entry of the judgment on October 31, 2007. We note that the case-action summary has an entry on October 24, 2007, the day of the final hearing, stating: “Trial this date and order issued with [counsel for the maternal grandparents] to prepare order.” The Supreme Court of Alabama has recently addressed this issue, stating:
“We hold that if a party moves for a judgment as a matter of law or, in the alternative, for a new trial before the court has entered judgment, the motion shall be treated as having been filed after the entry of the judgment and on the day thereof.”
New Addition Club, Inc. v. Vaughn, 903 So.2d 68, 72 (Ala.2004); see also Rule 4(a)(3), Ala. R.App. P.; and Richardson v. Integrity Bible Church, Inc., 897 So.2d
*548 345, 347 (Ala.Civ.App.2004) (“[A] premature postjudgment motion that, if it had been directed to a final judgment, would toll the time for filing a notice of appeal from a final judgment (see Ala. R.App. P., Rule 4(a)(3)) ‘quickens’ on the day that the final judgment is entered.”). The judgment in this case was not entered until the day after the father’s postjudgment motion was filed. The postjudgment motion is treated as having been filed after the entry of the judgment, on the day the judgment was entered. Id. That motion was deemed denied by operation of law on November 14, 2007. After the father’s postjudgment motion was denied by operation of law, his November 9, 2007, timely notice of appeal became effective on November 14. Rules 4(á)(3) and (a)(5), Ala. R.App. P.; New Addition Club, Inc. v. Vaughn, 903 So.2d at 72.
The juvenile court had jurisdiction to hear the maternal grandparents’ August 17, 2007, petition for custody. On May 11, 2007, 9 days after the mother’s death, the maternal grandparents filed a dependency petition alleging that the child was dependent and in need of care and supervision because the child had no parent or guardian able to provide for her support, training, and education. The maternal grandparents alleged that the child was dependent, thereby triggering the dependency statutes of the Juvenile Code. Ex parte W.H., 941 So.2d 290 (Ala.Civ. App.2006); W.T. v. State Dep’t of Human Res., 707 So.2d 647, 650 (Ala.Civ.App.1997) (superseded by statute on other grounds). Section 12-15-30, Ala.Code 1975, provides that “the juvenile court shall exercise exclusive original jurisdiction of proceedings in which a child is alleged to be ... dependent” and that the juvenile court “shall also exercise exclusive original jurisdiction of ... [proceedings to determine custody ... of a child when the child is otherwise before the court.” § 12-15-30(a) and (b)(1), Ala.Code 1975.
Because the child was properly before the juvenile court based on the maternal grandparents’ dependency petition, the juvenile court also had jurisdiction to adjudicate the parties’ custody dispute. § 12-15-30(b)(1); see also F.D.M. v. C.D.S., 646 So.2d 117, 118 (Ala.Civ.App.1994)(holding that the trial court did not have jurisdiction only pursuant to § 12-15-30(a), Ala. Code 1975, but also because the child was properly before the court); Ferguson v. State, 251 Ala. 645, 38 So.2d 853 (1949) (holding that the trial court could properly exercise concurrent jurisdiction when there was an emergency relating to the immediate welfare of a child, when the mother had filed a dependency petition in the trial court, and despite the fact that decrees from Virginia were entitled to full faith and credit).

Facts

The maternal grandmother testified that the child had lived with her for the first three and the last three years of the child’s life and that the maternal grandparents had been her primary caregivers and had also sometimes assisted the mother, their daughter. She was quite clear that the father had hardly been involved in the child’s life in any capacity. On May 2, 2007, when the mother overdosed and died, the child was and had been living with the maternal grandparents.
In June 2000 the mother and the father divorced; at some point approximately three years later, after the mother had remarried, the mother and the child moved to Louisiana. In June 2005, the mother and the child relocated to Alabama because both had been victims of domestic violence. Ultimately, the mother returned to Louisiana after reconciling with her second husband, but the child remained with *549 the maternal grandparents. The maternal grandmother enrolled the child in the school where the maternal grandmother is a teacher. The child has attended that school since kindergarten and, at the time of trial, was in second grade.
The maternal grandmother testified that the father had seen the child only one time. She stated that the father had never telephoned the child at her home before this action was initiated, despite her having lived at that residence and having maintained her telephone number for the child’s entire life. She also testified that the child had never received cards, letters, or presents from the father at her residence or to her knowledge. The maternal grandmother testified that she had never received support or financial assistance from the father. After the mother’s death, the maternal grandmother secured Social Security benefits for the child. The maternal grandmother also testified that, after the filing of the dependency action and the custody petition and after the court had ordered visitation, the father had visited the child three times but had been unable to attend a fourth scheduled visitation.
The maternal aunt testified that, pursuant to the mother’s and the father’s June 2000 divorce judgment, she had been designated to supervise visitations. That supervised visitation was scheduled to occur from 12:00 p.m. through 6:00 p.m. every other weekend from June 1, 2000, until May 21, 2001. The maternal aunt testified that, despite the visitation schedule, the father had visited her home only twice, on nonconsecutive occasions. Additionally, the father only visited the child for approximately one hour during each of those visits and was never alone with the child. The maternal aunt also stated that she had lived for over 15 years at the same address where the supervised visitation had occurred but that the father had never contacted her to attempt to schedule another visitation or to locate the child.
The father testified that he had seen the child more than one time; when asked how many times he had seen his eight-year-old child, the father responded: “ten, twelve, thirteen.” The father admitted that he had seen the child twice at the maternal aunt’s residence. The father testified that visitation had been arranged at his sister’s home as an alternative. The father claimed that the mother had been abusive during one visitation at the maternal aunt’s home. The maternal aunt contradicted that testimony. The father claimed that he had then visited the child at his sister’s home “numerous” times. This apparently occurred when the child was approximately one year old. The father also testified that he had seen the child once when the child lived in Louisiana.
The father admitted that he had not seen the child since he had visited her in Louisiana in 2005, when she was five years old. The father described this last visit as lasting 15 or 20 minutes and stated that the child had never left the vehicle in which she had been seated during the visit. The father testified that he had been completely unaware that the child and her mother had returned to Alabama in 2005.
At one point the father claimed that he had spoken to the child on the telephone on Father’s Day in 2006; however, the father admitted that he had not referred to himself as the child’s father until his recent visits during the pending action. Although the father admitted that he had not told the child he was her father, he claimed that the mother had forbidden him to call himself the child’s father. At the final hearing, the father testified that the last time he had spoken to the child on the telephone was when the child lived in Louisiana sometime in 2005 or before.
*550 The father blamed the mother for his inability to see the child. The father testified that the mother had been violent and had threatened him and had also physically attacked both him and his current wife. The father later testified that there had been no way to visit with the child without being involved in a fight or confrontation with the mother. The father admitted that he had never previously filed an action seeking custody, seeking to enforce his visitation rights, or seeking to hold the mother in contempt for her conduct. The father claimed that he had been unable to afford to file an action, but he also claimed that his residency status prevented legal aid from assisting him as well. He stated that he believed that he would have been unable to gain custody or visitation in an action against the mother.
The father admitted that during the pendency of this action he had failed to visit the child as scheduled. The father testified that he had not visited the child on one occasion because the maternal grandmother had not confirmed the scheduled visit.
The father admitted that he owed a child-support arrearage of an unknown amount and that he had not been paying child support since the child left Louisiana in 2005 because “[a]fter that there was no known address.” The father also admitted that, despite being ordered to provide medical insurance for the child in the June 2000 divorce judgment, he had not done so.
The maternal grandmother testified, without objection, that the child had confided in her school counselor regarding the sadness she was experiencing worrying that the father would take her away from the maternal grandmother. She testified that it would be “devastating” for the child to be ordered to live with her father and that the child had a great deal of apprehension about that possibility.
Dr. Kathleen Heath, a children’s therapist and licensed professional counselor, as well as a marriage and family therapist specializing in the assessment and treatment of children and adolescents, testified. She stated that the maternal grandmother had brought the child to see her. She testified that she had seen the child three times and had spoken with the maternal grandmother but that she had not had the opportunity to speak with the father. Dr. Heath testified that the child had concerns about instability in her family. Regarding her father’s gaining custody of the child, she stated: “[Sjadly, [the child] views this as a threat in terms of she feels like she’s going to have to move and be away from the family that she knows and loves and feels secure with at that point in time.” Dr. Heath further testified that the child was trying to go through the grief process regarding her mother’s death as well as “begin a new relationship with a parent that she has not known.” When questioned about the child’s progress in terms of healing, Dr. Heath opined:
“At this point, I would have to say no, in that she is almost what I would describe — her anxiety is so high about the home stability, having to leave her family, her school, that she has not been able to openly welcome her father. Because I think she just views that situation like, oh, I have to move. And for a child who has suffered the traumatic death of her mother, she is so insecure. I mean, probably the most important relationship a child ever has is with their parent and it just — the thought of having to leave has really been very threatening to her.”
Dr. Heath testified regarding the child’s continued treatment, stating:
“I think everybody has agreed that she certainly needs to develop a relationship with her father. But I — at this point, I
*551 have to encourage that she doesn’t have the specter of moving to tie with that. I just think she’s got to be able to grieve the loss of her mother, first and foremost, and then be able to open herself to her dad and welcome him, her dad, and his family. I think it will come but she is not at a point of being able to even enjoy this right now. It’s frightening to her .... ”
Dr. Heath was asked: “Do you believe based on your meetings with [the child] if she were forced to move it would be traumatic for her?” She responded: “I think we would be looking at the prospect of taking the child who has had what we would call the grieving process going on and adding in another trauma and looking at possibly a child with posttraumatic stress. Yes. I think it could be destructive to her.”
Dr. Heath testified that, based on the father’s own testimony, the father’s contact with the child had been minimal. She agreed that even if the father had visited the child 12 times, that contact was minimal. Dr. Heath testified that children with large changes in their lives, such as the death of a parent, are going through the grieving process and need to feel safe and secure in familiar surroundings.
Dr. Heath testified that the child was ambivalent about her father’s recent visits. The father’s counsel asked Dr. Heath: “You don’t feel like the child feels like she has to choose between her father and her grandparents?” Dr. Heath responded: “I haven’t had that feeling because I feel at this point the choice is made. The grandparents have been in her life and she has that bond with them.”
The principal of the school where the child is enrolled testified that the child had attended the school for the past three years. The child is a “model student” and has not been disciplined. She does not have any excessive tardies or absences. The principal testified that the child and the maternal grandmother’s relationship “is a model relationship between a grandmother and child.” She testified that the child appears well-cared for, is appropriately clothed, and eats a healthy diet.

Analysis

The juvenile court’s October 31, 2007, judgment states, in pertinent part:
“1. The Court hereby finds that the natural father ... relinquished custody of this eight (8) year old child by failing to pursue or exercise visitation with the child and by his absence in the child’s life. Sole legal and physical custody of the child known as [T.R.T.] is hereby awarded to [the maternal grandparents], which the Court finds to be in the best interest of the child under the circumstances.”
That judgment then provides extensive and liberal visitation to the father and orders that he pay child support to the maternal grandparents.
On appeal, citing Ex parte Terry, 494 So.2d 628 (Ala.1986), the father argues that the juvenile court’s judgment should be reversed because, he asserts, the court failed to apply the presumption that, in a custody dispute involving a nonparent, a parent has a prima facie right to the custody of his or her child. However, the juvenile court clearly did afford the father the benefit of that presumption, but the maternal grandparents overcame that presumption by ■ presenting clear and convincing evidence demonstrating that he had voluntarily forfeited his right to custody.
In Ex parte Terry, the Supreme Court of Alabama stated: “ ‘A natural parent has a prima facie right to the custody of his or her child. However, this presumption does not apply after a voluntary forfeiture *552 of custody or a prior decree removing custody from the natural parent and awarding it to a non-parent.’ ” 494 So.2d at 630 (quoting Ex parte McLendon, 455 So.2d 863, 865 (Ala.1984)) (emphasis omitted).
In Ex parte Berryhill, 410 So.2d 416 (Ala.1982), the Supreme Court of Alabama addressed a situation involving a custody dispute between a natural father and a stepfather after the mother’s death. The supreme court adopted the facts as they were enumerated by the Alabama Court of Civil Appeals in Berryhill v. Berryhill, 410 So.2d 413 (Ala.Civ.App.1982). The Court of Civil Appeals stated:
“At the time of the hearing [the child] was almost ten years old. He had known only his stepfather and mother as his parents, having lived with his stepfather at least six of the last eight years and continually the last four years. Very strong ties had developed between the boy and his stepfather during that time. They had developed a loving father-son relationship during the child’s formative years as evidenced by the testimony of [the child’s] school teachers, the family doctor, neighbors and relatives pertaining to displays of affection common between the two, and the stepfather’s concern over [the child’s] physical, emotional and educational well-being. The child has progressed well in school, has a great many friends and playmates and has always lived in Mobile. He is well-adjusted, very polite and happy. His stepfather is a sheet metal worker and earns in excess of eleven dollars per hour. He is a good employee, can provide the child with a place to live and relatives to look after him while the stepfather is at work. The future for [the child] in these surroundings appears stable and bright.
“The natural father has not lived with the child since before he was two years old. He had moved to Guin, Alabama, and the child had not seen him in four years. He has not attempted to visit [the child] during that time. [The child] did not recognize his father upon seeing him a few weeks prior to the hearing. To put it succinctly, the father showed little interest in providing for or being with his son for the four years prior to the death of the mother. He is, for all practical purposes, a stranger to his son.”
410 So.2d at 414-15. The Court of Civil Appeals then applied a best-interests standard and awarded custody of the child to the stepfather, concluding:
“Although there is no direct testimony that the father is generally unfit morally as a parent, he is fifty-three years old, dependent upon a small disability check from Social Security and the largess of his elderly parents. He has made no contribution either to the physical, financial or emotional well-being of his child. Such evidence indicates lack of parental interest closely akin to abandonment. Evidence of parental unconcern for and disinterest in the physical and financial well-being of a child over a period of years surely may be considered as indicative of unfitness.”
Id. at 415.
However, the supreme court reversed the judgment and remanded the case to the Court of Civil Appeals for that court to order the trial court to conduct further proceedings. Ex parte Berryhill, supra. In reversing the judgment and remanding the case, the supreme court stated:
“The disagreeable and heart-rending nature of cases such as this cannot fail to be appreciated. However, this Court has recently adhered to that strong presumption in Sullivan v. Mooney, Ala., 407 So.2d 559 (1981), wherein we quoted *553 with approval from Griggs v. Barnes, 262 Ala. 357, 78 So.2d 910 (1955):
“ ‘The law devolves the custody of infant children upon their parents, not so much upon the ground of the natural right in the latter, as because the interests of the children, and the good of the public, will, as a general rule, be thereby promoted. It is a fair presumption, that so long as children are under the control of their parents, they will be treated with affection, and then1 education and morals will be duly cared for ....
“ ‘... So strong is the presumption, that “the care which is prompted by the parental instinct, and responded to by filial affection, is most valuable of all”; and so great is the reluctance of the court to separate a child of tender years from those who according to the ordinary laws of human nature, must feel the greatest affection for it, and take the deepest interest in its welfare, — that the parental authority will not be interfered with, except in case of gross misconduct or where, from some other cause, the parent wants either the capacity or the means for the proper nurture and training of the child. Where a contest for the custody of a child arises between its father or mother and a third person, the superior claim of the parent ought not, in our opinion, to be disturbed, unless it plainly appears that the interests of the child require it to be set aside. [Striplin v. Ware, 36 Ala. 87, 89-90 (I860).]’
“The references of the Court of Civil Appeals to the father’s age and present financial condition do not establish the clear and convincing evidence that the natural father is either unfit or unsuited for the role of the father, and the case, therefore, must be remanded in order to allow the well-intentioned trial court to consider the case on the principles established in those decisions.”
410 So.2d at 417-18. Ex parte Berryhill merely directed the Court of Civil Appeals to order the trial court to apply the proper parental presumption in favor of the natural father. Id.; see also R.K. v. R.J, 843 So.2d 774, 784 (Ala.Civ.App.2002).
In this case, the juvenile court heard disputed, oral testimony from several witnesses. There was testimony regarding the father’s lack of involvement in the child’s life, regarding the father’s failure to support the child, and regarding the fact that the father had to be located and found by the maternal grandparents to be informed, not only of the mother’s death, but also of the child’s whereabouts and of the pending dependency petition as well. The father admitted that he was completely unaware of his child’s location after she left Louisiana in 2005 and that he took no steps to locate her or to enforce his visitation or custody rights. The juvenile court heard testimony regarding the father’s present financial condition and age as well.
Unlike in Ex parte Berryhill, the juvenile court had ample testimony to consider regarding all aspects of the father’s life and current conditions. Moreover, as its judgment indicates, the juvenile court did afford to the father the parental presumption that a child’s best interests are served by being in the custody of its natural parent, but it found that the maternal grandparents had overcome that presumption by presenting clear and convincing evidence demonstrating that the father had voluntarily relinquished his right to custody. Cf. Ex parte Berryhill, supra.
In Ex parte D.J., 645 So.2d 303 (Ala. 1994), the Supreme Court of Alabama analyzed a situation in which the natural father and the maternal grandmother sought custody of a child after the mother’s death. *554 The child had been born out-of-wedlock in 1983 and had lived intermittently with the mother and the maternal grandmother. 645 So.2d at 304. The mother died on April 27, 1991. The father promptly filed a petition to legitimate the child in the probate court on July 19, 1991. That petition was granted on September 5, 1991. Id.
However, also on July 19, 1991, the maternal grandmother petitioned for custody of the child. The trial court convened a hearing and awarded custody to the grandmother, subject to visitation by the father. The court also scheduled a second hearing in order to review “ ‘whether or not the child [had so] progressed in his relationship with his father ... that it would be appropriate for the child to be placed in the home of the father.’” Id. at 304-05.
“After the second hearing, which convened on August 19, 1992, the court entered an order in which it found, inter alia, that [the father] and the ‘stepmother [were] able and anxious to provide for the child.’ However, it further stated: ‘[T]he court does find that it is in the best interest of [the child] that custody remain with [the maternal grandmother].’ ”
Id. at 305.
In Ex parte D.J., the supreme court discussed the parental presumption and the voluntary forfeiture of custody that strips a parent of that presumption. Id. at 306-07. Unlike this case, the mother and the father in Ex parte D.J. were not married at the time the child was born, but the parties married at some time after the birth of the child. The supreme court reasoned: “it is the absence of a right residing in [the father] before [the mother’s] death that renders [the maternal grandmother’s] relinquishment argument untenable.” Id. at 307. The supreme court analogized the case to Rainer v. Feldman, 568 So.2d 1226, 1227 (Ala.1990), a case involving two separate actions filed by the mother and the father of an illegitimate child. The trial court in Rainer dismissed the mother’s action because the father had filed his action first. The supreme court in Rainer reversed,
“noting that Ala.Code 1975, § 6-5-390, vested the right to prosecute an action for wrongful death of a child born out of wedlock solely in the parent ‘having legal custody.’ Rainer [v. Feldman ], 568 So.2d [1226,] 1227 [ (Ala.1990) ] (emphasis in Rainer). It held that the ‘superi- or right of custody,’ id. at 1227, long enjoyed by the mothers of children born out of wedlock, rendered [the mother] the ‘legal’ custodian, and, therefore, the proper party to prosecute the action under the statute. Id. at 1218.”
Ex parte D.J., 645 So.2d at 307. Regarding voluntary relinquishment, the supreme court in Ex parte D.J. then stated:
“Guided by this rule, we conclude that ... a putative father who, before [the mother’s] death never possessed legal or physical custody of his unlegitimated child, acquired no custody rights that could have been relinquished to [the mother]. Custody vested exclusively in [the mother] at the birth of her child and remained there until she died April 27, 1991. [The father] did not, therefore, relinquish any custody rights before [the mother’s] death, because — vis-a-vis [the mother], at least — he possessed none. Moreover, his promptness in initiating legitimation proceedings and in seeking custody after her death conclusively rebuts any contention that he relinquished custody rights thereafter. Thus, we conclude that the ‘relinquishment’ exception to the parental presumption provided no basis for the stan *555 dard applied by the trial court in this case.”
Id. at 307 (footnote omitted).
In the present case the parties were married when the child was born, and they divorced in June 2000 when the child was seven months old. The father had inchoate custody rights and was undisputedly the father, rather than a putative father, from the moment of the child’s birth. The father was awarded visitation pursuant to the June 2000 divorce judgment. The father admits that he exercised very little visitation over the child’s entire life, and his counsel conceded that the father’s contact with the child had been “minimal.” Unlike the father in Ex parte D.J. who promptly filed a legitimation proceeding and sought custody after the mother’s death, the father in this case had to be sought out by the maternal grandparents at the order of the juvenile court. Only in response to the maternal grandparents’ dependency petition and their petition for custody did the father file an answer and counterclaim. The father admitted that he had never filed any previous action regarding the child during her lifetime and that he would have waited an indefinite period before doing so had the maternal grandparents not filed their action.
This case is more similar to Ex parte G.C., 924 So.2d 651 (Ala.2005). In that ease, the Supreme Court of Alabama determined that there was sufficient evidence to support the trial court’s judgment awarding custody to the child’s maternal grandparents based upon its finding that a father had voluntarily relinquished custody of his child. 924 So.2d at 658-59. In Ex parle G.C., the mother and the father began a relationship resulting in the mother’s pregnancy. That relationship ended before the father learned that the mother was pregnant. The parties never married. Although the father was out of town when the child was born, he did see the child two weeks later. Two months after the child’s birth, a DNA test confirmed that the father was, in fact, the child’s biological father. Id. The mother and the child lived with the child’s maternal grandparents, and, several months after the child was born, the mother left the child at the maternal grandparents’ house. The father did visit the child some:
“The father visited the child several times during the first year and was present for the child’s first birthday. The father did not visit with the child much during the second year because he was working out of state. In August 2000, 14 months after he had learned that he was the biological father of the child, the father filed in the probate court a declaration of legitimation, requesting that he be determined to be the child’s father. The trial court issued the order of legitimation, and the child’s last name was changed to the father’s.”
924 So.2d at 653.
In affirming the trial court’s determination that the father had voluntarily relinquished custody, the supreme court specifically enumerated several grounds supporting a finding of voluntary relinquishment, stating:
“The record contains ample evidence to support the trial court’s finding that the father had voluntarily relinquished custody of the child to the maternal grandparents. A paternity test conducted two months after the birth of the child established that the father was the child’s biological father. Despite this knowledge, the father waited until August 2000 when the child was 16 months old to legitimate the child in probate court. Therefore, we must determine whether there is sufficient evidence from August 2000, when the father was legally declared by a court to be the father of *556 the child, that he voluntarily relinquished custody of his child.
“As the trial court noted, the father ‘fully admits that he has waited until now to assert any rights he may have to this child.’ Specifically, the father waited from August 2000 until February 2003 to request custody of his child. During that time, with the exception of a six-month period when the child resided with the mother, the child resided with the maternal grandparents. They reared the child while the father enjoyed the convenience of visitation. During this time, the evidence indicates that the father visited with his son sporadically, that he did not assist in his care, and that he abdicated any and all decisions with regard to the health and welfare of the child to the mother and the maternal grandparents.
“Moreover, in September 2000, when the mother gave the maternal grandparents temporary guardianship of the child in the form of a limited power of attorney to make any decisions related to the physical custody, health, education, or maintenance of the child, the father did not seek custody of the child or show any interest or willingness to assist in the daily care of the child. The father admitted that from August 2000 to December 2002 (during the second and third years of the child’s life), he wanted the child to live in the home of the maternal grandparents. In October 2002 when the mother overdosed on heroin, the maternal grandparents, concerned for the child’s welfare, contacted the father about removing shared custody of the child from the mother. The father, who shared joint legal and physical custody of the child with the mother, did not exercise his prima facie right to custody at that time, but instead sought joint custody with the maternal grandparents and allowed them to continue rearing the child. Indeed, when asked why he had never spent 24 hours alone with his son, the father admitted that he had had the opportunity to but chose not to exercise that opportunity for bonding time with the child.”
Id at 657 (footnote omitted).
In Ex parte G.C., the supreme court quoted the trial court’s judgment regarding the father’s voluntary relinquishment of custody:
“ ‘6. The father admits that this move will traumatize [the child]. The father also admits that [the child] thinks of the [maternal grandparents] as his parents. The father fully admits that he has waited until now to assert any rights he may have to this child. ...
“ ‘7. Finally, the father agreed in his testimony that [the child] should not be taken out of the [maternal grandparents’] home at this time and placed in his custody. ...
“ ‘Based on the above, the court finds by clear and convincing evidence that both parents voluntarily abandoned their parental responsibilities to this child, and as a result [the child] has no true parental bond with either of them. The mother now clearly recognizes this fact[;] the father recognizes that he wasn’t there for all those years, but states that he wants to be there now.
“ ‘Unfortunately, those years have made all the difference in [the child]’s world because the child’s security and bonding to the maternal grandparents took place during that time that the father was not interested in asserting his parental rights.” ’
Id. at 655.
In this case, even more so than Ex parte G.C., there is clear and convincing evidence to support the juvenile court’s finding that the father voluntary relinquished *557 custody. The record reveals that the father exercised visitation with the child for approximately one hour, on two, nonconsecutive occasions at the home of the maternal aunt. This was when the child was between seven months and one year old. The father testified that he had visited the child “numerous” times at his sister’s home in Mobile. The father also claims to have visited the child in Louisiana 1 time, although he admits that during the visit, which lasted approximately 20 minutes, the child did not leave the vehicle. Even if the juvenile court believed that the father had visited the 8-year-old child each time he claimed, the father’s own testimony indicates that the maximum number of visits between the father and the child would have been 13.
The father admitted that he had not seen the child since 2005, and, although he claims that he spoke to the child on Father’s Day in 2006, when the child was living with the maternal grandparents, the maternal grandmother testified that she was unaware of the child’s having spoken to the father. The father also admitted that he had not told the child that he was, in fact, her father at the mother’s request.
The maternal grandmother and the maternal aunt testified that the father had never contacted them to inquire about the child or even to ascertain the child’s location. Both had lived at their current residences and had the same contact information, which was known to the father, since before the father had been absent from the child’s life.
The father admitted that he had not paid child support at least since sometime in 2005, and he admits to a child-support arrearage that he estimates to be between $8,000 and $4,000. The father admitted that, despite being ordered to do so in the June 2000 divorce judgment, he had not had the child enrolled on his medical insurance.
The father blamed the mother for his failure to visit his child. The father admitted that he had never previously instituted an action to enforce his visitation rights, to seek custody of the child, or to have the mother held in contempt of court. The father claimed that he had sought legal assistance in Alabama, Georgia, and Louisiana but that he had been unable to obtain assistance from legal aid and that he had been unable to afford to bring a legal action against the mother.
Dr. Heath confirmed the maternal-grandmother’s testimony that the child felt anxiety over the potential of having to move to South Carolina with her father. She further testified that such a move could cause the child to develop post-traumatic stress syndrome.
Although the father argues that the juvenile court failed to accord him the parental presumption described by Ex parte Terry, supra, that is clearly not the case. The juvenile court specifically found: “[T]he natural father '... relinquished custody of this eight (8) year old child by failing to pursue or exercise visitation with the child and by his absence in the child’s life.” The juvenile court afforded to the father the parental presumption, but it found that the presumption did not apply because the father had voluntarily forfeited his right to custody of the child. This finding is supported by clear and convincing evidence. The juvenile court then correctly applied the best-interests standard and awarded the child to the maternal grandparents, subject to liberal visitation by the father. The juvenile court did not err in this regard, and its decision as to this issue is due to be affirmed.
Moreover, it is well settled that we may affirm a trial court’s judgment for any reason presented by the record, even one *558 not argued by the parties or rejected by the trial court. Liberty Nat’l Life Ins. Co. v. University of Alabama Health Servs. Found,., P.C., 881 So.2d 1013, 1020 (Ala. 2003). The juvenile court could have found from the father’s own testimony that he had voluntarily relinquished custody of the child to the maternal grandparents. The father testified:
“I told [the maternal grandmother] on the phone my intention was not to come down there and take that child screaming from what she knows as her security and having lost her mother. I wanted to come down here and the two of us go somewhere and visit and start off with that. That was my intention.”
He testified that he did not want to drive to Alabama and “snatch” the child because he did not wish to put the child through such an ordeal. The father testified that he wished to establish a relationship with the child and wanted her to get to know her stepmother and stepbrothers. The following exchange occurred at the September 7, 2007, hearing:
“Q. [Counsel for the father:] And you’re content to leave her with [the maternal grandparents] until the Court says it’s time for you to take your daughter home, but you do intend to take her home eventually.
“A. [The father:] Yes, I do.”
At the October 24, 2007, hearing the following exchanges occurred:
“Q. [Counsel for the father:] And I think you understand, to, that there’s going to be a graduated thing for you to visit more and more often with your daughter?
“A. [The father:] Right. ... And I said that I wanted to let her know that I knew that I couldn’t just go grab an 8-year-old child that I haven’t seen in years, that it was going to be a process. And I wanted us to work together. I wanted [the child] to see me with her at Chuck E. Cheese’s or wherever so that she knew that there were two groups of people that loved her and wanted her best interest and not two people that were fighting over her attention. And she agreed with what I was saying and we agreed that we were going to meet that weekend and it was going to be [the maternal grandmother] and [the child] and I. We were going to do that — that atmosphere.
“From point one I understood it’s not — and I do understand it’s not in her best interest to yank her and take her away. I wanted the transition so that everybody was involved working together is what the — is the goal I’ve been— I — what I’ve been suggesting throughout.”
The father agreed that, when the child was ready, he wanted her to come and visit his home. He testified:
“Yes. I do want her to go and live with me. And yes, as I explained to [counsel for the father] and to [the maternal grandmother] and to [the guardian ad litem] that I understand it had to be a transitional process, that it was not in [the child’s] best interest. As I told [the maternal grandmother] the first day she called, if I didn’t want to do what was in her best interest mentally given the situation, I would have hung up the phone and drove to Alabama and snatched her, but I told [the maternal grandmother] that wasn’t — I knew that wasn’t the best thing for her.”
The father testified that “eventually” he wanted the child to move in with him. Given the father’s testimony, which is similar to the testimony of the father in Ex ■parte G.C., the juvenile court could have concluded that the father had relinquished custody to the maternal grandparents.
*559 The father next argues on appeal that the juvenile court erred in calculating the amount of child support due pursuant to Rule 32, Ala. R. Jud. Admin. “ ‘[Matters of child support are within the sound discretion of the trial court and will not be disturbed absent evidence of an abuse of discretion or evidence that the judgment is plainly and palpably wrong.’ ” Taylor v. Taylor, 991 So.2d 228, 232 (Ala.Civ.App. 2008) (quoting Spencer v. Spencer’, 812 So.2d 1284,1286 (Ala.Civ.App.2001)).
The father argues that the juvenile court should have used the maternal grandparents’ combined income, rather than the amount received from Social Security by the child on account of the mother’s death, to calculate the amount of child support due. In its October 31, 2007, judgment the juvenile court stated that it was following the Rule 32 child-support guidelines and was using the Social Security benefit received by the child as the maternal grandparents’ income.
The juvenile court should have used the maternal grandparents’ gross monthly income to calculate the monthly child-support amount due. “[A] custodial grandparent who invokes the jurisdiction of the court for a determination regarding the matters of custody and support of children may be ordered to do that which he would not be otherwise legally bound.” Pruitt v. Pruitt, 669 So.2d 931, 932 n. 1 (Ala.Civ.App.1996); see also O.L.D. v. J.C., 769 So.2d 299 (Ala.Civ.App.1999); and Ex parte Lipscomb, 660 So.2d 986 (Ala.1994).
The father testified that he had recently received a raise and that his yearly salary was $69,000. His monthly gross income is therefore $5,750. Also, the father submitted an income affidavit to the juvenile court stating that his gross income was $4,750 per month and indicating that he incurred $1,600 per month in child-care expenses. The father testified that he paid $80 per month for the child to be covered by his medical insurance. The maternal grandmother testified that the maternal grandparents’ gross income was $106,000 per year, or $8,833 per month. Thus, the parties’ combined gross income is in excess of $10,000 per month.
Because the parties income exceeds the uppermost levels of the Rule 32 child-support guidelines, we note that Rule 32(C)(1), Ala. R. Jud. Admin., provides: “The court may use its discretion in determining child support in circumstances where combined adjusted gross income ... exceeds the uppermost levels of the schedule.” This court has said:
“The Comment to Rule 32 states that ‘[wjhere the combined adjusted gross income exceeds the uppermost limit of the schedule, the amount of child support should not be extrapolated from the figures given in the schedule, but should be left to the discretion of the court.’ When the parties’ combined income exceeds the uppermost limit of the child-support schedule, the determination of a child-support obligation is within the trial court’s discretion. Floyd v. Abercrombie, 816 So.2d 1051, 1057 (Ala.Civ. App.2001); Dyas v. Dyas, 683 So.2d 971 (Ala.Civ.App.1995). ‘[A] trial court’s discretion is not unbridled and ... the amount of child support awarded must relate to the reasonable and necessary needs of the children as well as to the ability of the obligor to pay for those needs.’ Dyas v. Dyas, 683 So.2d at 973.”
Arnold v. Arnold, 977 So.2d 501, 507 (Ala. Civ.App.2007).
Also, we note that the record does not include a GS-42 Child-Support Guidelines form, although the juvenile court stated in its order that it was following the Rule 32 child-support guidelines. We also *560 note that the record does not contain a CS-41 “Child Support Obligation Income Statement/Affidavit” form from the maternal grandparents; these forms are mandatory in an action to establish or modify child-support obligations. O.L.D. v. J.C., 769 So.2d at 303; Martin v. Martin, 637 So.2d 901 (Ala.Civ.App.1994).
We affirm the juvenile court’s award of custody to the maternal grandparents and its finding that the father voluntarily relinquished custody. We reverse the juvenile court’s judgment as to child support, and we remand this case to the juvenile court so that it may comply with Rule 32, Ala. R. Jud. Admin.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
THOMPSON, P.J., and PITTMAN and BRYAN, JJ., concur.
MOORE, J., dissents, with writing.

. The maternal grandmother testified that the father had visited with the child only one time immediately after the parents’ divorce. The child's maternal aunt testified that the father had visited the child twice and that both visits had been when the child was between seven months and one year old. The father testified that in 8 years of the child's life he had visited with the child 10, 12, or 13 times. The father's counsel admitted that the father had had "minimal'' contact with the child.

. The Certificate of Death issued by the State of Louisiana lists "Methadone and Propoxy-phene Toxicity" as the immediate cause of the mother’s death. There was testimony from the maternal grandmother, to winch the father’s attorney did not object, indicating that the woman who discovered the mother's corpse informed her that the mother had been abusing methadone. It was undisputed that the maternal grandmother and the maternal aunt were unaware of the mother's methadone abuse until after the mother's demise.