STUART, Justice.
G.C., Jr. (“the father”), appealed to the Court of Civil Appeals from a judgment awarding custody of his minor son, J.G.C. (“the child”), to E.B. and D.B. (“the maternal grandparents”). The Court of Civil Appeals affirmed the judgment without an opinion. G.C. v. E.B. (No. 2030309), 919 So.2d 329 (Ala.Civ.App.2004) (table). We granted the father’s petition for certiorari review.
The evidence in the trial court revealed the following facts. The father and L.B. (“the mother”) met at a Narcotics Anonymous meeting in 1998. They began a relationship that eventually resulted in the mother’s pregnancy. They ended the relationship before the mother informed the father that she was pregnant; however, the father became aware that the mother was pregnant before the birth of the child in April 1999. The father and mother never married. At the time of the child’s birth, the father was working out of town. The father saw the child two weeks after the child was born. Two months after the birth of the child, the father requested a paternity test, which established that he was the biological father. The mother and the child lived with the maternal grandparents for several months after the child was born. At some point, the mother moved out of the maternal grandparents’ house and left the child with the maternal grandparents.
The father visited the child several times during the first year and was present for the child’s first birthday. The father did not visit with the child much during the second year because he was working out of state. In August 2000, 14 months after he had learned that he was the biological father of the child, the father filed in the probate court a declaration of legitimation, requesting that he be determined to be the child’s father. The trial court issued the order of legitimation, and the child’s last name was changed to the father’s.
In February 2002, after the mother forcibly removed the child from the maternal grandparents’ home, the maternal grandparents sought temporary custody of the child. In April 2002, the trial court entered a pendente lite order, awarding the mother custody of the child and awarding the maternal grandparents specified visitation. The father received notice of that order and subsequently intervened in the proceedings. As a result, he was awarded regularly scheduled visitation with the child.
In August 2002, the mother, father, and maternal grandparents entered into an agreement, pursuant to which the mother and the father were to have joint legal and physical custody of the child and the maternal grandparents were to have specific visitation rights. The trial court entered an order adopting the agreement. In October 2002, while the child was visiting with the father, the mother overdosed on heroin and was unable to care for the child. As a result, at the urging of the maternal grandparents, the father and the *654 maternal grandparents filed a joint petition to modify custody, seeking to remove shared custody from the mother. The trial court entered a pendente lite order, awarding joint physical custody of the child to the father and the maternal grandparents.
In February 2003, the father filed a petition seeking full custody of the child, claiming that the maternal grandparents had taken thé position that their right to the child was superior to his. Following a hearing at which evidence was presented ore tenus,[1] the trial court awarded sole custody of the child to the maternal grandparents, subject to the visitation rights of the father. In denying the father’s request for full custody, the trial court, in an order dated December 10, 2003, concluded that the father had voluntarily relinquished custody of the child to the maternal grandparents and that he was unfit to have custody. The trial court made the same findings regarding the mother. The mother, however, does not dispute those findings.
Specifically, the trial court stated in its order:
“Despite the petition of the grandparents requesting that they be granted joint custody with the father, the father requests that he be granted primary custody of the child.[2] This court cannot grant such a request due to a record replete with evidence that points to the father’s unfitness and voluntary abandonment of this child. As to the father, the record reflects that:
“1. The father was not present at the birth of the child. He claims that he was out of town on business. He did not even tell his mother about the child until the child was 7 months old. He and the mother never lived together. The father chose not to legitimize the child until about a year and five months after the birth of the child, claiming he didn’t have the $200.00 to pay for it then. The first time he met the [maternal grandparents], which was when [the child] was around 18 months old, he did not even state his last name.
“2. The father lived at home with his parents till he was twenty-four years old. He moved out to live with a friend, [W.H.] He lived with [W.H.] for three or four months and moved back home. He lived at home for another year and a half then moved in with Mr. [T.] He has been back home for the past year living with his mother. He says he will move out but he doesn’t know when- — he has made no plans to do so.
“3. The father has a history of quitting jobs after three or four months. He has finally maintained a job with his current employer ... for a little over two years now, although he is no longer working as a business installer. The father claims to have saved $1,200.00 since February of 2003, but he did not have a plan for his money. Although he requested full custody of his child, he had never thought to budget for [the child]’s clothes or school. When questioned about his monthly expenses, the father stated that he pays his mother *655 $50.00 per month to live in her home, pays for car insurance, his cell phone bill, and for food and gas. He sold his own car and now drives his father’s. After going through his expenses and income the father learned that he had over $4,200.00 from February that he could not account for. The father is oblivious at age 30 about where his money goes. The evidence is clear that he has never had to manage his money because his parents loaned [him money] and paid debts for him for years.
“4. Upon cross-examination the father admitted that he had abandoned a former girlfriend when she got pregnant. She later lost the baby. He admitted that he might have abandoned the child, as well. His current girlfriend’s name is ‘Winter.’ He could not remember her last name. He met her at her place of employment — a Waffle House [restaurant]. He recently gave up an opportunity to have visitation with [the child] to go out on a date with this girlfriend.
“5. The father had a full month in the summer of 2003 to have visitation with his son. Even with accommodations made with the [maternal grandparents], the father chose not to exercise the visitation, claiming that he had no more vacation days left at work and he did not want to put [the child] in daycare. The evidence further shows that the father never exercises visitation with [the child] alone. Until the last hearing in September, the father has never spent 24 hours alone with his own son.
“6. The father admits that this move will traumatize [the child]. The father also admits that [the child] thinks of the [maternal grandparents] as his parents. The father fully admits that he has waited until now to assert any rights he may have to this child. He admits that his own mother took the active role in issues involving [the child] until February of 2003. The father admits that he has no idea what size clothes [the child] wears because his mother likes to buy the clothes for [the child] and goes with him and picks them out and she knows the sizes. The father admits that he still relies on the [maternal grandparents] to see to [the child]’s medical needs, i.e. taking him to the doctor, etc., because he (the father) ‘has to work’; despite admitting that he has time to pick up a friend and eat breakfast before work.
“7. Finally, the father agreed in his testimony that [the child] should not be taken out of the [maternal grandparents’] home at this time and placed in his custody. Even ... the paternal grandmother admitted that the [maternal grandparents] were the ones that made [the child] a top priority, as she noted that she and her son were preoccupied with her husband’s terminal illness.
“Based on the above, the court finds by clear and convincing evidence that both parents voluntarily abandoned their parental responsibilities to this child, and as a result [the child] has no true parental bond with either of them. The mother now clearly recognizes this fact[;] the father recognizes that he wasn’t there for all those years, but states that he wants to be there now.
“Unfortunately, those years have made all the difference in [the child]’s world because the child’s security and bonding to the maternal grandparents took place during the time that the father was not interested in asserting his parental rights. That’s the whole point of the emphasis being added by our Supreme Court in its opinion in [Ex parte] Terry, [494 So.2d 628 (Ala.1986)]. *656 That is why there are exceptions to the ‘Terry ’ standard.
“This court finds by that same clear and convincing evidence that this father is currently unfit to have custody of any child. Based on the totality of the evidence the father can hardly manage himself, much less the addition of a child. He hasn’t a clue where his money goes, his mother continues to dominate most if not all of the aspects of his life, he cannot manage this four-year-old child alone and has succeeded in giving this court not one positive reason to place the child in his custody. The father at age 30 appears extremely immature, concerned with satisfying his own personal needs, easily dominated and influenced by others and incapable of rearing a child without tremendous assistance from others, which would most likely include his mother, with whom he admits to having a very rocky relationship. The court further finds that based on the evidence presented, the child tolerates the paternal grandmother but has been made fearful of her by her loud and threatening exchanges in front of him.”
As noted previously, we granted the father’s petition for certiorari review to determine whether there was clear and convincing evidence that the father was unfit to have custody or that he had voluntarily relinquished custody of the child to the grandparents.
In reviewing the record in a custody case in which the evidence is presented ore tenus, this Court is not permitted to reweigh the evidence and to substitute its judgment for that of the trial court. Ex parte Bryowsky, 676 So.2d 1322 (Ala.1996). Our review in such a case is limited to whether there was sufficient evidence to support the trial court’s findings. We will not disturb the findings of the trial court unless those findings are clearly erroneous. 676 So.2d at 1324. Indeed, as Chief Justice Moore, writing for the Court, stated in another child-custody proceeding:
“When this Court reviews a trial court’s child-custody determination that was based upon evidence presented ore ten-us, we presume the trial court’s decision is correct: ‘ “A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong....’” Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994), quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ.App.1993) (citations omitted). This presumption is based on the trial court’s unique position to directly observe the witnesses and to assess their demeanor and credibility. This opportunity to observe witnesses is especially important in child-custody cases. ‘In child custody cases especially, the perception of an attentive trial judge is of great importance.’ Williams v. Williams, 402 So.2d 1029, 1032 (Ala.Civ.App.1981).”
Ex parte Fann, 810 So.2d 631, 633 (Ala.2001)(emphasis added).
 . In a custody dispute between a parent and a nonparent, the parent has a prima facie right to custody over the non-parent. Ex parte Terry, 494 So.2d 628 (Ala.1986). This presumption does not apply, however, in a case in which the parent voluntarily forfeits his or her right to custody to a nonparent or where there is a finding of unfitness on the part of the parent. Any finding that the parent is unfit must be based on clear and convincing evidence. 494 So.2d at 633.
We address first whether the father has voluntarily relinquished custody of the child. The child has never resided with *657 the father. In Ex parte D.J., 645 So.2d 303 (Ala.1994), this Court determined that an examination of whether a father of a child born to unmarried parents relinquished his right to custody of the child must begin at the point in time when the father was legally declared by a court to be the father of the child. See also R.K. v. R.J., 843 So.2d 774 (Ala.Civ.App.2002); and R.O.M. v. B.B., 854 So.2d 98, 105 (Ala.Civ.App.2003) (Murdock, J., concurring specially).
The record contains ample evidence to support the trial court’s finding that the father had voluntarily relinquished custody of the child to the maternal grandparents. A paternity test conducted two months after the birth of the child established that the father was the child’s biological father. Despite this knowledge, the father waited until August 2000 when the child was 16 months old to legitimate the child in the probate court.[3] Therefore, we must determine whether there is sufficient evidence from August 2000, when the father was legally declared by a court to be the father of the child, that he voluntarily relinquished custody of his child.
As the trial court noted, the father “fully admits that he has waited until now to assert any rights he may have to this child.” Specifically, the father waited from August 2000 until February 2003 to request custody of his child. During that time, with the exception of a six-month period when the child resided with the mother, the child resided with the maternal grandparents. They reared the child while the father enjoyed the convenience of visitation. During this time, the evidence indicates that the father visited with his son sporadically, that he did not assist in his care, and that he abdicated any and all decisions with regard to the health and welfare of the child to the mother and the maternal grandparents.
Moreover, in September 2000, when the mother gave the maternal grandparents temporary guardianship of the child in the form of a limited power of attorney to make any decisions related to the physical custody, health, education, or maintenance of the child, the father did not seek custody of the child or show any interest or willingness to assist in the daily care of the child. The father admitted that from August 2000 to December 2002 (during the second and third years of the child’s life), he wanted the child to live in the home of the maternal grandparents. In October 2002 when the mother overdosed on heroin, the maternal grandparents, concerned for the child’s welfare, contacted the father about removing shared custody Of the child from the mother. The father, who shared joint legal and physical custody of the child with the mother, did not exercise his prima facie right to custody at that time, but instead sought joint custody with the maternal grandparents and allowed them to continue rearing the child. Indeed, when asked why he had never spent 24 hours alone with his son, the father admitted that he had had the opportunity to but chose not to exercise that opportunity for bonding time with the child. The record reveals the following occurred during cross-examination of the father by counsel for the maternal grandparents:
*658 “[Maternal grandparents’ counsel]: And, Mr. [C.], isn’t that just a pattern of yours not to take the initiative, but to let [the maternal grandmother] do all of the things necessary for the care of your son, doctor’s appointments, preschool, you have done that all of his life, haven’t you?
“(No audible answer from witness.)
“[Maternal grandparents’ counsel]: And you are still doing it, aren’t you?
“[Father]: Yes.”
The record is replete with similar examples that provide evidence indicating that the father has forfeited his right to custody of the child, relying upon the maternal grandparents to provide for the child’s housing, care, and well-being.
As the Court of Civil Appeals recently stated in K.C. v. D.C., 891 So.2d 346, 349 (Ala.Civ.App.2004), when confronted with a similar situation in which it concluded that the father had voluntarily relinquished his right to custody:
“The grandparents approached the father in 1998, alerted him to facts indicating that the mother was possibly unfit, and told him that the mother had requested that the grandparents rear the child. Under Ex parte Terry, [494 So.2d 628 (Ala.1986),] the father had the superior right to custody, had he chosen to act upon it. Instead, he chose to allow the grandparents to take on the role of parents and to rear the child. The father’s actions and statements, as recalled by the grandparents, belie an intent to fulfill his parental role after the mother’s choice to abdicate her parental responsibility to the grandparents. Certainly, the father has acted with some degree of responsibility by visiting with the child and by paying some expenses, including day-care expenses and school tuition. However, voluntary relinquishment is not the equivalent of abandonment, and a finding of voluntarily relinquishment need not be supported by evidence that a parent has neglected to visit with or provide for his child.”
Based on the foregoing, the trial court did not err in finding that the father had voluntarily relinquished custody of the child to the maternal grandparents and thereby lost his prima facie right to custody.[4] For this reason, the trial court’s *659 judgment, awarding custody of the child to the maternal grandparents, is due to be affirmed.
The father also challenges the trial court’s finding that he is an unfit parent. Having voluntarily relinquished custody of his child, the father has lost his prima facie right to custody of his child. If at some point in the future the father again seeks custody of the child, he will have to prove that he is a fit parent and he also will have to meet the McLendon standard, that is, he will have to prove that a change in custody would materially promote the child’s best interest and, additionally, that the benefits of modifying custody would more than offset the inherently disruptive effect of uprooting the child by such a change of custody. See Ex parte McLendon, 455 So.2d 863 (Ala.1984).
Why does it matter whether the father is declared unfit to have custody at this time since the father has lost his prima facie right to custody of the child by voluntary relinquishment? It matters because a finding of fitness at this time will become the law of the case. Ex parte S.T.S., 806 So.2d 336 (Ala.2001). He would be permitted unjustifiably to wipe his parental slate clean. In the future he will have to show only that he is a fit parent from the time of the most recent custody hearing forward. Ex parte S.T.S., 806 So.2d at 341.
The father argues that the issue of his unfitness as a parent was not pleaded. When one seeks custody of a minor child, *660 fitness as a parent or person fulfilling the parental role is inherently at issue. Indeed, the father injected the issue of “fitness” into the proceedings, when he averred in his motion for custody of the child that “he is a fit parent in every respect and is fully capable of caring for the minor child.” Although no witness labeled the father an “unfit parent,” there was extensive testimony concerning his suitability to serve as the child’s sole custodian. Therefore, the issue of “fitness” was undoubtably litigated.
The issue of parental fitness is not fitness to visit with the child while he or she is in another’s custody. The issue of fitness is whether the parent is fit to have the care, custody, and control of, that is, the total responsibility for, the child. See § 12-15-1(17), Ala.Code 1975. Unfitness to have custody at a particular time is not necessarily the equivalent of grounds for termination of parental rights, however. A parent may, after being found unfit, become a fit parent and at that time seek custody of the child.
We now address whether the trial court’s finding that the father is an unfit parent is supported by clear and convincing evidence in the record.[5] A review of the record indicates that each factor noted by the trial court as a ground for finding the father is unfit is supported by clear and convincing evidence and that the father admits most, if not all, of those factors. The father, in actuality, does not even argue that he is fit for the responsibility at this time. Moreover, the father’s voluntary relinquishment of custody is a primary factor indicating unfitness. The record also reveals that the father ceased paying child support when the child’s maternal grandparents were caring for the child. The record further establishes that at the time of the hearing he had drafted a budget, but he had not considered in the budget the expenses of caring for the child; that he refused “for convenience sake” to assume responsibility, other than providing insurance, for the medical needs of the child; and that he had not asked the maternal grandparents whether the child was presently enrolled in preschool. Indeed, the father admitted that in July 2003 the father chose to pick his child up on Saturday, instead of the scheduled Friday night for the weekend visitation because he had a “big date.” The foregoing are only a few of the many examples establishing that the father at this time is unfit to assume custody of the child. Clear and convincing evidence established that at this time the father is not ready to assume the care, custody, and control of, that is, the total responsibility for, the child. Because the record supports by clear and convincing evidence the trial court’s finding that the father is unfit to have custody of the child at this time, the trial court’s judgment, awarding custody of the child to the maternal grandparents is also due to be affirmed on this basis.
*661 “ ‘Neither the Court of Civil Appeals nor this Court is allowed to reweigh the evidence in this case. This case, like all disputed custody cases, turns on the trial court’s perception of the evidence. The trial court is in the better position to evaluate the credibility of the witnesses ... and the trial court is in the better position to consider all of the evidence, as well as the many inferences that may be drawn from that evidence, and to decide the issue of custody.’”
Ex parte Patronas, 693 So.2d 473, 475 (Ala.1997).
Based on the foregoing, the judgment of the Court of Civil Appeals is affirmed.
AFFIRMED.
NABERS, C.J., concurs.
STUART, SMITH, and BOLIN, JJ., concur specially.
WOODALL, J., concurs in the result.
SEE, LYONS, and HARWOOD, JJ., concur in part and dissent in part.
PARKER, J., dissents.

. As Justice Parker notes in his dissent, the maternal grandparents sought joint custody, not full custody, of the child. They testified that the father should be part of the child's life. However, the father requested sole custody rather than joint custody with the maternal grandparents, which changed the nature of the proceedings and "solicited” the trial court’s review of his custody rights.

. The father admitted at the hearing that in his deposition he stated that “it just was not a top priority to have [the child] legitimized.” The father also admitted that the paternal grandparents, who did not learn about the child until the child was seven months old, “brought up” the subject of legitimizing the child. The father admitted that despite the fact that he was 27 years old and working full-time, he did not have the money to pay for the legitimation so the paternal grandfather paid the $200 filing fee. The father stated that he subsequently repaid the paternal grandfather.

. Justice Parker in his dissent maintains that the evidence does not establish that the father knew of his right to custody and that he voluntarily and intentionally relinquished custody. First, every man is charged with knowledge of the law, see Atkins v. Parker, 472 U.S. 115, 130-31, 105 S.Ct. 2520, 86 L.Ed.2d 81 (1985)("All citizens are presumptively charged with knowledge of the law.... The entire structure of our democratic government rests on the premise that the individual citizen is capable of informing himself about the particular policies that affect his destiny.”); therefore, the father’s ignorance of the law does not justify his not exercising his right to custody once he had his son legitimized in the probate court.
Moreover, the father’s actions and admissions clearly establish that he knew that he could have exercised his right to custody. The father "had a gut feeling” when the mother informed him that she was pregnant that the child was his child, and he was happy about the child. The father visited the child within two weeks of the child’s birth and at that time discussed having a paternity test performed. Within two months of the child’s birth in June 1999, a paternity test was conducted that conclusively established that he was the father. The father visited the child in August 2000, during the child's first year and legitimated the child when the child was 16 months old. The father admitted that he knew in September 2000 that the mother had given the maternal grandparents’ decision-making authority regarding the child through a power of attorney and that he did not object or request custody of the child at that time. He admitted that in February 2002 he went with the maternal and paternal grandparents to an attorney’s office to discuss the mother’s conduct. The father admitted that he did not *659 interject into the discussion that he wanted custody of the child and that at that time he wanted the child to stay with the maternal grandparents. Indeed, even the father recognized that he was charged with a responsibility to find out his rights to custody of the child because when he was asked why he did not take steps to gain custody of his child when the child was not living with him or the mother, the father responded, “I didn't know what my rights were and I didn't — I didn’t further investigate anything." (Emphasis added.) These admissions by the father and his interaction with the legal system during the child's first three years of life clearly establish that the father knew and had an opportunity to investigate and establish his right to custody of the child. This observation of the father's knowledge of custody and yet his refusal to assert it is bolstered by the admission of the paternal grandmother that she and the father realized the father could have at any time asserted his right to custody. Clearly, the father and the paternal grandmother realized he had rights to the child, but the father decided not to investigate and determine how to exercise those rights.
Justice Parker maintains that "the record shows a consistent pattern of behavior on the part of the father of voluntary petitions to the court for increased recognition of his paternal rights, including the right to custody (initially joint and later sole), as he became aware of the extent of his rights as a father of an illegitimate child.” 924 So.2d at 683-84. While the record does exhibit a gradual increase in the father’s interest in the child, the record clearly establishes that the father's interest is limited to spending more time with his child, that is, receiving more liberal visitation. None of the facts establish an increased role of the father in the day-to-day decision-making and care for the welfare of the child— that is, a desire for full custody of the child. For example, the father admitted that instead of taking the child to the doctor when he noticed, during a visitation that occurred between the May and September hearing dates, that his child was ill he asked the maternal grandmother to set up the appointment and take the child, because "it was a convenience thing.” Indeed, the record clearly establishes that the only reason he petitioned the court for full custody of his child was because he believed that his visitation with the child had been unjustly limited by the maternal grandparents. The father unequivocally replied at the hearing when asked if he thought custody should be awarded in full to him then, "no.” While the record repeatedly establishes that the father does want to increase the amount of visitation he has with his child, it also unequivocally establishes that his petitions to the court are a product of his desire to have the convenience of more liberal visitation, not the responsibility of full custody.

. Justice Parker in his dissent maintains that the trial court impermissibly shifted the burden of proof to the father to prove that he is fit to have custody. In support of his contention, he relies on the following clause in the trial court's order, "[The father] has succeeded in giving this court not one positive reason to place the child in his custody.” The trial court’s statement in its entirety reads, "He hasn’t a clue where his money goes, his mother continues to dominate most if not all of the aspects of his life, he cannot manage this four-year-old child alone and has succeeded in giving this court not one positive reason to place the child in his custody." (Emphasis added.) The trial court’s observation that "the father has succeeded in giving this court not one positive reason to place the child in his custody" indicates the trial court's recognition that the father can present evidence to rebut the evidence indicating unfitness. Such a statement, in light of the detail in the trial court's order, does not indicate an improper shifting of the burden of proof.