MOORE, Chief Justice
(dissenting).
G.N., Jr. (“the father”), appealed the juvenile court’s termination of his parental rights to his son, G.N.N. (“the child”). The Court of Civil Appeals affirmed, without an opinion. G.N., Jr. v. Cullman Cnty. Dep’t of Human Res. (No. 2120639, Sept. 27, 2013), — So.3d - (Ala.Civ.App. 2013) (table). This Court granted certio-rari review; it now quashes the writ. I respectfully dissent.
Although allegations of domestic violence have been made concerning the father arid his wife, C.N. (“the mother”), no evidence indicates that the child was ever “in imminent danger from the surroundings ... and that the removal of the child is necessary for the protection of the health and safety of the child.” § 12-15-306(a)(1), Ala.Code 1975. I believe the juvenile court lacked legal grounds to remove the child from his parents because there was no evidence of “[hjarm or the risk of harm to the emotional, physical health, or welfare of a child.” § 12-15-301(2), Ala.Code 1975. In addition, because allegations of domestic violence against a spouse do not provide legal grounds for the termination of parental rights, I believe the father’s parental rights were terminated without clear and convincing evidence, as required by § 12-15-319(a), Ala.Code 1975.

I. Facts and Procedural History

At the time of the proceedings below, the father and the mother had been together for about 13 years. The mother has two children from a prior relationship, K.H., a daughter, and C.H., a son. In 2006, the Department of Human Resources (“DHR”) became involved with the family on account of the parents’ domestic violence and illegal drug use. The parents refused to take drug screens or to cooperate with DHR’s safety plans for the children. The mother told DHR to put the children into foster care. DHR instead located a relative who took custody of the children.
The child was born in 2009. The parents planned to give the child up for adoption, but they decided to keep the child after he was born. After the child’s birth, hospital staff expressed concerns to DHR about the parents’ ability to parent the child and the domestic violence in the home. A DHR caseworker investigated the reports but took no action. DHR had no further contact with the family in 2009.
*83 In 2010, presumably at the age of 13, K.H. returned to the house where the mother and the father were living. K.H. testified that things were good in the beginning but that they got progressively worse because the parents would often fight. In August 2010, DHR received a report that the parents were using drugs, that there was no food in the house, that K.H. was sleeping on the floor, and that the father had thrown water on K.H. to wake her up. D.M., the father’s mother, had moved into the family home after being diagnosed with cancer. D.M. reported that some of her prescription pain medication was missing. A DHR caseworker investigated and found no evidence of recent physical abuse or inadequate food but did not, determine what happened to D.M.’s medication. DHR had no further involvement with the family in 2010.
On January 1, 2011, the mother attempted to leave the father. The mother got into her vehicle, and, while she was holding the child, the father attempted to remove the mother from the vehicle by pulling her legs. The mother was able to hand the child to K.H., and no one was injured. Later the same month, the child became very ill and started vomiting. The mother thought that the father had poisoned the child and took the child to Children’s Hospital of Alabama in Birmingham, where the child was treated for a stomach virus. A nurse then told the mother that she was free to take the child home. The mother told the nurse that she did not want to go home because the father physically abused her, and she asked the nurse for help in getting away from the father. The mother said that the father had threatened her. “with lawyers.”
The hospital contacted DHR, which began an investigation. The mother became angry and told DHR that she was going home with the father. DHR interviewed the family, including K.H., who was 14 years old at the time. K.H. reported that the parents had been violent toward one another shortly before the hospital visit. DHR also learned that the parents were being treated by psychiatrists, that they were using prescription medication, and that the father had been diagnosed with post-traumatic stress syndrome after his military service during Operation Desert Storm and the War in Iraq.'
DHR thereafter obtained a “pick-up” order from the juvenile court and took the child and K.H. into protective custody. DHR’s “Comprehensive Family Assessment” indicates that the “Original Reason the Family’s Case was Opened for Services” was:
“There were concerns for [the child] (1) and [K.H.] (14). [The child] was at Children’s Hospital for a fever and vomiting. [The mother] reported to the nursing staff that she was afraid to go home because she had been threatened by her husband, [the father]. She stated the trailer had wires under it and the phones were bugged. She stated she and her husband were both recovering addicts and she is currently taking Per-cocet and slept with her prescription so that [the father] couldn’t take the bottle from her and accused her of taking too much. [The mother] admitted to physical violence in the past [;] however no police reports have been filed. [The mother] states [the father] is playing games that no one can understand. She accused her stepson[1] of casting spells on her with sardines and boiled eggs and a plastic baggie placed on top of the trailer. It was stated in hospital paperwork that ‘someone’ is trying to make the [child] sick by putting a baggie of *84 sardines and boiled eggs in to the water while [the mother] was washing the baby’s bottles.
“It was learned that the most recent occurrence of domestic violence was on January 1, 2011 by [the father] and [the mother] where [the father] held [the mother] down and drug [sic] her out of the car by her feet. [K.H.] and [the child] were both present and [K.H.] tried to intervene. [The mother] was holding the [child] some time during the altercation. Police were called but no report was filed. [The mother’s] behavior was volatile at the hospital. Both parents did not understand the risk to children from the domestic violence and their behaviors. They were unable to arrange for third party for safety plan.”
K.H. thanked a DHR caseworker for removing her from the parents’ home because she was scared to be at home with all the fighting between the parents. The mother’s sister took custody of K.H. On January 18, 2011, the child was placed in foster care. He was approximately 18 months old. DHR offered the parents supervised visitation with the child and counseling, but the parents were resistant to working with DHR.
Debra Coffey, a DHR caseworker, identified the services the parents needed in order to be reunited with the child — counseling, psychiatric care, substance-abuse counseling, and drug screens. The parents were not receptive to DHR’s services. The parents either did not show up for the drug screens or refused to take the screens. The father refused counseling because he was receiving counseling through the Department of Veterans Affairs (“the VA”). The VA provided counseling for the father to treat his post-traumatic stress syndrome and' to help him deal with his home life and his anger issues and to teach him how to cope without resorting to violence. The VA required the father to submit to unannounced drug screens at least once a month. The father testified that he had not failed a VA drug screen.
In February 2011, the father, at DHR’s request, was given a'psychological evaluation by Dr. Barry Woods. Dr. Woods found that “no test results ... support the idea that the [father] is prone to violence toward his wife, his children, or others.” Dr. Woods attempted to evaluate the father’s relationship with the child, but the father responded to Dr. Woods’s questions “with excessive defensiveness that rendered [his answers] uninterpretable and invalid.”
Beginning in January 2011, DHR provided the parents services from Transforming Lives, a company that provides in-home parenting-skills training, budgeting classes, and marital counseling and skills training. Although the parents attended visitation with the child during that period, they were not compliant with recommendations or redirection about their parenting skills. The parents often spent their visitation complaining about DHR’s involvement with the family. In July 2011, Michael Goodwin, a counselor at Transforming Lives, supervised the parents’ visitation. Goodwin testified that the child enjoyed the visitation with the parents. Goodwin testified that he did not have any specific issues with the parents’ parenting skills but that there was “room for improvement.” In November 2011, Transforming Lives stopped providing services to the parents because they were resistant to any counseling that was not provided through the VA.
At the end of 2011, DHR referred the parents to counseling with Sherry Brown. The goal was for the parents to begin individual counseling and then to proceed to marital counseling. Brown had three or *85 four individual sessions with each parent. However, Brown did not think the parents would make progress because the father thought he had no need to be there, and she stopped the counseling sessions.
On April 10, 2012, approximately 15 months after the child had been placed in foster care, DHR filed a petition to terminate the parental rights of the parents to the child. In May 2012, a DHR worker reinitiated DHR’s efforts to offer the parents services, including individual counseling, marriage counseling, parenting assistance, and domestic-violence counseling. As before, the parents would agree to participate in such services only through the VA. However, the parents agreed to submit to drug screens, and they participated in the “court-referral program.” The parents tested positive for opiates, but both were taking prescription opiates as part of their mental-health treatment. The parents continued regular visitation with the child.
On October 12, 2012, a DHR worker again told the parents that DHR needed both of them to attend domestic-violence counseling. The father insisted that he would not participate in such counseling unless it was through the VA. After being contacted by a DHR supervisor, the father’s VA caseworker told the father that he should participate in DHR’s counseling program. The father contacted DHR and indicated he wanted to participate in domestic-violence counseling. However, the father never began domestic-violence counseling.
At the time of the trial in March 2013, the mother and the father were living in a rented three-bedroom, one-bathroom house. DHR had no concerns about the physical adequacy of the home. The father received $3,500 a month in VA disability and Social Security income. His expenses were approximately $2,000 a month. The parents did not provide any support for the child after he entered foster care in January 2011. At the time, the parents had been married for 13 years, and the father planned to remain married to the mother.
In late 2012, the father and mother started attending couples counseling in Decatur, where they learned skills to improve their marriage. According to the father, “the most useful thing” that had improved his relationship with the mother was that he now worked out of town and he was no longer at home all day. The father testified that he loved the child and that he would never hurt the child. He testified that he was still being treated by the VA for anger issues but that his VA caseworker would testify that the child was not in danger from the father. The father testified that there had not been a police report of domestic violence filed against him since 1999, when his ex-wife had filed a report.[2] Between late 2011 and mid 2012, the police had responded to two domestic-violence incidents at the parents’ home, but no arrests were made.
On March 8, 2013, the juvenile court held a hearing on DHR’s petition to terminate the father’s and the mother’s parental rights as to the child. On April 18, 2013, the juvenile court entered a judgment terminating their parental rights and found:
“[T]he parents have been noncompliant and/or unable to make improvements to their situation ... [T]he father and mother of the minor child are unable or unwilling to discharge their responsibilities to and for the minor child[,] the *86 conduct or condition [of the parents] is únlikely to change in the foreseeable futureU the child is dependent[,] and there is no viable alternative other than termination of parental rights.”
The mother did not appeal the juvenile court’s judgment. The father timely appealed, and the Court of Civil Appeals affirmed the judgment of the juvenile court without an opinion. This Court granted certiorari review, which it now quashes.

II. Standard of Review

“ ‘The ore tenus rule applies in cases involving termination of parental rights. When the evidence is presented ore tenus, the judgment of the trial court is “presumed correct and will be set aside only if the record reveals the judgment to be plainly and palpably wrong.” ’ ” Ex parte J.R., 896 So.2d 416, 423 (Ala.2004) (quoting G.D.M. v. State, 655 So.2d 1020, 1022 (Ala. Civ.App.1995)). “[The ore tenus] rule does not relieve this Court of its responsibility to ensure that those facts clearly and convincingly warrant the termination of parental rights.” Ex parte T.V., 971 So.2d 1, 9 (Ala.2007). The clear-and-convincing standard requires “an exacting level of certainty based on evidence of the parent’s current situation.” Id. This Court does “ ‘ “not sit in judgment of the facts,” ’ ” but “ ‘ “review[s] the factfinder’s determination of facts only to the extent of determining whether it is sufficiently supported by the evidence, that question being one of law.” ’ ” Id. (quoting Hinds v. Hinds, 887 So.2d 267, 272-73 n. 2 (Ala.Civ.App.2003), quoting in turn Curtis White Constr. Co. v. Butts & Billingsley Constr. Co., 473 So.2d 1040, 1041 (Ala.1985)).

III. Analysis

A. Removal of the Child from Parental Custody

Alabama’s juvenile courts have jurisdiction over child-dependency proceedings. § 12-15-114, Ala.Code 1975. Under Alabama law, “[a] child or minor may be taken into [protective] custody ... [pursuant to an order of the juvenile court.” § 12-15-125(a)(l), Ala.Code 1975. The court’s “pickup order” must be supported by a petition that sets forth “with specificity” the facts that bring the child under the juvenile court’s jurisdiction, the facts constituting the child’s alleged dependency, and the facts showing that the child is in need of the care or protection of the State. § 12-15-121(c)(l), Ala.Code 1975.
The child was not dependent[3] His parents were providing “for the care, support, or education of the child,” § 12-15-102(8)2, Ala.Code 1975, and were discharging their “responsibilities to and for the child.” Id. at (8)6. The child was not abused. § 12-15-301(2), Ala.Code 1975 (defining “abuse” as “[h]arm or the risk of harm to the emotional, physical health, or welfare of a child”). There is no evidence indicating that the one incident of alleged domestic violence involved any “harm or the risk of harm” to the child. The parents’ domestic violence was directed toward one another, not the child. The child was not neglected. § 12-15-301(7), Ala.Code 1975 (defining “neglect” as “the failure to provide adequate food, medical treatment, supervision, education, clothing, or shelter”). In fact, DHR’s investigator interviewed the family right after the parents had obtained medical attention for the child.
The child was taken into the State’s protective custody because of the parents’ bizarre behavior, one incident of alleged *87 domestic violence, and the parents’ lack of understanding about the risks of that behavior or violence to the child. The evidence indicates that the mother was able to hand the child to K.H. during the one incident of alleged domestic violence. No member of the family was injured. • In fact, DHR’s “Comprehensive Family Assessment” never stated that the child was directly at risk. Rather, the juvenile court removed the child from his parents because the parents lacked understanding that their bizarre behavior and the alleged domestic violence might put the child at risk. Although I acknowledge that parent-on-parent domestic violence may put children at risk on a variety of levels, a parent’s lack of understanding about the risks of domestic violence, without a demonstration of actual harm or risk to the child, should not vest the juvenile court with jurisdiction over the child.
The parents simply did not understand or comprehend that their conduct might create potential risks for the child. Other than this lack of understanding, they were fit parents. Where there was no evidence of abuse, neglect, or exploitation of the child, the “pickup order” does not make sense, apart from DHR’s mandate to protect children from even the risk of violence.
DHR has the duty to “[s]eek out and prevent or remedy the neglect, abuse or exploitation of children.” Rule 660-1-2-.01(2)(a), Ala. Admin. Code (DHR). DHR has a mandate
“to seek out and aid minor children in the state who are in need of its care and protection, and protective services shall be made available in an effort to prevent further abuse and neglect, and to safeguard and enforce the general welfare of such children.”
Rule 660-5-34-.13(l)(a), Ala. Admin. Code (DHR). DHR’s child-protective-services workers are tasked with
“analyzing parents’ or primary caregivers’ protective capacities; determining to what extent parents or primary caregivers are able and willing to control threats and manage risks; and determining if identified risks are significant enough to warrant on-going services in order to prevent maltreatment.”
Rule 660-5-34-13(4), Ala. Admin. Code (DHR). “Protective capacities” are “parenting/caregiving knowledge and skills; attachment to the children; awareness of and ability to interpret and meet children’s needs; and a willingness and ability to act protectively when the children experience safety threats.” Rule 660-5-34-14(4), Ala. Admin. Code (DHR). Thus, a parent’s lack of “protective capacities,” as determined by DHR’s child-protective-services workers, may be sufficient to warrant the removal of “dependent” children from their parents.
Under Alabama law, the- final definition of “dependent child” is a child “[w]ho, for any other cause, is in need of the care and protection of the state.” § 12-15-102(8)8, Ala.Code 1975 (emphasis added). This “catch-all” definition allows DHR’s child-proteetive-services workers to remove children from their parents for causes undefined by Alabama law, including causes that might never occur. “Any other cause” might include family conditions and circumstances “that threaten child safety” or conditions that “present[ ] a risk of serious harm to the children” and conditions that, “if left unchanged, can cause child abuse/neglect,” or which “are likely to cause abuse/neglect if ongoing services are not provided.” Rule 660-5-34-.14(l)-(2), (6), and (9), Ala. Admin. Code (DHR).
The application of DHR’s mandate to seek out minor children in need of the *88 State’s protection has resulted in the child’s being wrested from his parents because of the parents’ lack of understanding about risks of certain behavior to the children. The juvenile court had no jurisdiction over the minds and understanding of the parents and cannot deprive them of their right to the custody and control of their child in the absence of child abuse, child neglect, or some other criminal offense concerning the child.[4]
One of the legal principles behind Virginia’s Statute for Religious Liberty applies directly in such cases:
“[T]o suffer the civil magistrate to intrude his powers into the field of opinion, and to restrain the profession or propagation of principles on supposition of their ill tendency, is a dangerous fallacy, which at once destroys all ... liberty, because [the civil magistrate] being of course judge of that tendency will make his opinions the rule of judgment, and approve or condemn the sentiments of others only as they shall square with or differ from his own; that it is time enough for the rightful purposes of civil government, for its officers to interfere when principles break out into overt acts against peace and good order....”
Virginia Statute for Religious Liberty, January 16, 1786, reprinted in I Documents of American History 126 (Henry Steel Commager, ed.1968). Likewise, I would hold that a juvenile court obtains jurisdiction over a child only when the parents’ lack of understanding actually “break[s] out into overt acts” of abuse, neglect, or some crime against the child. Allowing DHR to intrude its considerable legal powers into the realm of parental opinions and understanding because of a possible risk to a child is a dangerous fallacy and works to destroy the parental rights of parents in Alabama, rights that exist independent of law or organized government, being among those inalienable rights with which parents are endowed by their Creator. Art. I, § 1, Ala. Const. 1901.
B. The Basis for Termination of the Father’s Parental Rights
Allegations of domestic violence against a spouse do not furnish legal grounds for the termination of the spouse’s parental rights. Alabama’s juvenile courts may terminate parental rights only when the evidence is “clear and convincing, competent, material, and relevant in nature.” § 12-15-319(a), Ala.Code 1975. DHR’s “Petition to Terminate [the] Parental Rights” of the father and mother states:
“Neither parent understood that they were putting these children at risk due to their hostile behavior....
“... [N]either parent wás receptive to [DHR] providing counseling services to the family.... [T]he ... father goes to [counseling] appointments but refuses to participate and states that he does not need to be there.
“... The ... father has a history of domestic violence. He has poor coping skills and becomes volatile in stressful situations.
“... [T]he mother does not have the parenting ability to protect the child....
“The minor child is without proper parental care and control necessary for his well being because of the faults of the parents. The parents of said child dem *89 onstrate no significant interest in or sense of responsibility toward said child.
“... The parents have refused to adjust their circumstances to meet the needs of the child.
[[Image here]]
“[DHR] further prays that after the final hearing in this cause, the Court will terminate, permanently, any and all legal rights to the parents of said child as to his custody and grant permanent custody of said child to [DHR].”
(Emphasis added.) The juvenile court’s order reads, in part:
“[T]he parents have been noncompliant and/or unable to make improvements to their situation.... [T]he father and mother of the minor child are unable or unwilling to discharge their responsibilities to and for the minor child; the conduct or condition [of the parents] is unlikely to change in the foreseeable future; the child is dependent; and there is no viable alternative other than termination of parental rights.”
The parents’ ability and willingness to discharge their responsibilities to the child were never questioned until the juvenile court removed the child from his parents. The parents’ alleged noncompliance or inability pertained to their refusal to understand and address their alleged domestic-violence problem to DHR’s satisfaction. No evidence indicates that the child was directly at risk from the parents’ alleged domestic violence.
The father’s psychological evaluation indicates that “no test results ... support the idea that the [father] is prone to violence toward his wife, his children, or others.” The father testified that he loves the child and that he would never hurt him. The father admitted that he was still being treated for “anger issues” by the VA but that his caseworker would testify that the child is not in danger from the father. Although police responded to domestic-violence reports in the family home in 2011 and 2012, no arrests were made and no charges were filed. At trial, the father testified that he had obtained employment and was out of the house during the day, which helped improve the marital relationship. The parents had even attended counseling on their own initiative for several months before the trial.
In addition, the evidence regarding the parents’ ability to parent the child was positive. Michael Goodwin, a counselor at Transforming Lives, stated that he “did not have any specific issues with the mother and the father’s parenting skills” but that there was room for improvement. Goodwin also testified that the parents were willing to improve in this area. The parents maintained visitation with the child during these proceedings.
In sum, the evidence demonstrates that the parents were fit at that time DHR took the child and that they remained fit in many respects at the time of the trial. It appears, however, that the juvenile court terminated the parents’ rights as to the child not because they were bad parents, but because they were bad spouses. This conclusion appears unavoidable from the record and the juvenile court’s order but is simply not supported by the evidence. A man may be a bad husband or a bad parent, but a bad husband is not automatically a bad parent. The evidence does not rise to the level of clear and convincing evidence that would warrant the termination of the parental rights of the parents to the child under § 12 — 15—319(a), Ala. Code 1975, which requires “an exacting level of certainty based on evidence of the parent’s current situation.” Ex parte T.V., 971 So.2d at 9.

TV. Conclusion

I believe that the juvenile court in the first instance lacked legal grounds to order *90 the child taken into protective custody and ultimately lacked the clear and convincing evidence that would provide a legal ground for the termination of parental rights.

1. The father has three children from a prior marriage.

. This report was filed by the father’s ex-wife. A protection-from-abuse order was issued against the father in July 1999, but the ex-wife had filed a motion to dismiss the action about six days later.

. The child was not "dependent” under seven of the eight statutory definitions of "dependent child.” See § 12-15-102(8), Ala.Code 1975.

. Ex parte G.C., 924 So.2d 651, 677-78 (Ala. 2005) (Parker, J., dissenting) (noting that courts should take judicial notice that "God, not the state, has given parents these rights and responsibilities, and, consequently, that courts should interfere as little as possible with parental decision-making, instead deferring to parental authority whenever it has not been fundamentally compromised by substantial neglect, wrongdoing, or criminal act”).