Rel: May 22, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2025-2026

_____

### CL-2025-0032

_____

### B.F.

### v.

### C.D. and A.D.

### Appeal from Coffee Juvenile Court
### (JU-21-122.02)

<u>After Remand from the Alabama Supreme Court</u>

PER CURIAM.

The Alabama Supreme Court has reversed the prior judgment of this court reversing the judgment of the Coffee Juvenile Court ("the juvenile court") and has remanded the case to this court for further proceedings. See Ex parte C.D., [Ms. SC-2025-0655, Mar. 27, 2026] ___

So. 3d ___ (Ala. 2026), rev'g B.F. v. C.D., [Ms. CL-2025-0032, Aug. 22, 2025] ___ So. 3d ___ (Ala. Civ. App. 2025). In doing so, the supreme court overruled the two primary cases on which this court had relied in reaching its conclusion, Ex parte D.J., 645 So. 2d 303 (Ala. 1994), and Ex parte G.C., 924 So. 2d 651 (Ala. 2025), and established a new test to govern consideration of the issue this case presents. Ex parte C.D., ___ So. 3d at ___. We consider now, under that new test, whether the evidence supports the juvenile court's judgment.

## Background

The record on appeal indicates that S.G.R. ("the child") was born in April 2021 to M.R. ("the mother"), who had been in a nonexclusive, sexual relationship with B.F. ("the father"). In June 2021, the father was jailed for drug-related charges, and, in December 2021, he was sent to prison. In October 2021, the juvenile court found the child to be dependent and granted legal and physical custody of the child to C.D., a longtime friend of the mother, and A.D., C.D.'s husband. C.D. and A.D. also have custody of two of the mother's other children, who are the child's half siblings.

The father remained in prison until July 2022, when he was released to a rehabilitation program. At some point, he was placed in a

second rehabilitation program. In all, he remained in the rehabilitation programs for 18 months, completing the second program in December 2023.

In February 2024, the father filed a "petition to determine paternity and custody" in the juvenile court. He sought an order requiring genetic testing to determine whether he was the child's father. He also sought, if he was proven to be the child's father, an order adjudicating him the child's father and an award of custody of the child.

After genetic testing was conducted, with the results showing that the father was the child's natural father, the juvenile court entered an order on June 7, 2024, adjudicating the father as the child's father and setting a hearing on the father's remaining requests for relief.

At the final hearing, which the juvenile court held on December 3, 2024, the testimony was in sharp dispute over when the father had become aware or should have become aware that he was the child's father. On January 5, 2025, the juvenile court entered a final judgment. In its judgment, the juvenile court made the following findings:

> "The child was born on April 29, 2021, and in June 2021 as part of a safety plan initiated by the [Coffee County] Department of Human Resources, the child was placed in the home of [C.D.]. At the time of the child's birth there was no

3

legal or presumed father; however, evidence at this hearing was that [the father] knew that [the mother] was pregnant, that they had been engaged in a sexual relationship, [that] he was sent pictures of the child after birth, [that he] met and saw the baby when he was a couple of days old, and [that he] bought formula for the baby after he was born. In addition, the child's mother sent pictures and messages to [the father]'s mother [C.F.] of the baby after he was born, commenting that 'the baby looks like [the father].' The court finds this significant in that [C.F.] has worked for 25+ years with Embrace Kids, which is in some regard affiliated with the [Coffee County] Department of Human Resources in working … to reunify children with families and provide services to families in need. Less than six months after the child's birth a dependency petition was filed by the [Coffee County] Department of Human Resources and at the shelter[-]care hearing on October 4, 2021, the child was adjudged to be dependent, and custody vested with [C.D. and A.D.]. [C.D.] is a lifelong friend to the child's mother and also has custody of two of the mother's daughters who are half-siblings to this child. The half-siblings have been in the care and custody of [C.D.] and her husband since 2019. The child has remained in the exclusive care of [C.D.] since the adjudication of dependency and disposition and all of the child's needs are being met by [C.D. and A.D.].

"This most instant petition was filed on behalf of [the father] on February 15, 2024, nearly three years after the birth of the child. On June 4, 2024, the issue of paternity was addressed by the court and as [a] result of DNA genetic testing, and with no objection from the parties, [the father] was adjudged to be the father of the child. Despite the arguments and assertions of counsel prior to the final hearing the court determined that the appropriate standard to be applied in this matter was the [Ex parte] McLendon[, 455 So. 2d 863 (Ala. 1984),] standard. Counsel for the [father] argues that the appropriate standard would be the Terry standard (Ex parte Terry, 494 So. 2d 628 (Ala. 1986)), relying on R.O.M.

4

v. B.B., 854 So. 2d 98 (Ala. Civ. App. 2003). This Court in determining that the McLendon standard was appropriate relied first on the custody order in 19-JU-2021-122.01 which determined that the child was dependent and that physical and legal custody of the ... child was vested with the respondent [C.D.] (and her husband [A.D.]). In Ex parte McLendon the Alabama Supreme Court followed the case of Ex parte Matthews, 428 So. 2d 58 (Ala. 1983), in determining that 'a natural parent has a prima facie right to the custody of his or her child. However, this presumption does not apply after a voluntary forfeiture of custody or a prior decree removing custody from the natural parent and awarding it to a non-parent.' In this instant matter there is a clear prior [order], the order in JU-2021-122.01 dated October 4, 2021. Although at the time of that order the father of the child was unknown and [the father] was not noticed of that proceeding, this court is satisfied that the child's father ... had more than enough notice, information, and belief that he was the biological father of the child and failed to avail himself of the rights of a father and that through his own actions voluntarily forfeited any right to custody of the child. The father admitted that he has had a long history of substance abuse/misuse [and t]hat around the time of the pregnancy and birth of the child ... he and the child's mother engaged in the use of illegal controlled substances. It should be noted that the child was born positive for methamphetamine[], the drug of choice for the mother and [the] father. The child was born on April 29, 2021, and in June 2021 the father was arrested and incarcerated for the offense of possession or receipt of a controlled substance while he was on probation for the same type of offense. The father remained continuously incarcerated from June 2021 until he was sentenced to prison in December 2021. The father remained imprisoned until his release in July 2022 whe[n] he was sent to a substance abuse rehabilitation program for eighteen (18) months and was subsequently discharged from that program in December 2023. On February 15, 2024, the child's father filed this petition. For the majority of the child's life from birth until the

filing of this petition the father was either in jail, prison, or rehab, abandoning this child to the care of others. <u>This court is convinced that the father had more than enough notice and information that he was the father of the child, or at a minimum enough information to act on that belief over the course of the past three years prior to the filing of this petition in February 2024.</u> During that entire three-year period of time the child has resided exclusively in the home of [C.D. and A.D.]. It was … the father's voluntary choice to engage in the use of illegal controlled substances to the point that it led to his incarceration and imprisonment to his own detriment, but all the while abandoning the needs of this child to the care of [C.D. and A.D.]. It is noteworthy that the father seems to have addressed his substance-abuse past by remaining sober at present; however, <u>the court is convinced that the child's father knew of the existence of the child at the time he was making these decisions and voluntarily forfeited any right to the custody of the child by engaging in these illicit behaviors</u>. As previously mentioned, the father knew that the mother was pregnant, that they had been engaged in a sexual relationship, [that] pictures of the child [reflected that the child] looked like him as a baby, [that] he met and saw the baby when he was a couple of days old, and [that] he provided financial support for the benefit of the child, all prior to his incarceration and imprisonment. [The father]'s mother [C.F.] has made a career of working with families and possessed the inherent knowledge that comes with her profession to advise her son, and [the father] had the resources available to him to avail himself of any parental authority over the child; however, he failed to do so by his own volition. [The father] did not want to be a father to this child when this child was born and did not want to be a father to this child for the first three years of the child's life. Only now that he represents that he has 'changed' and 'cleaned himself up' does he want to assume the role of a parent. All the while, every need this child has had from the time he was placed in the home of [C.D.] have been met by [C.D.] and her husband. The child refers to [A.D. and C.D.] as 'daddy' and 'momma' and [C.D.

6

and A.D.] are the only mother and father this child has ever known. The child is now three years old and has resided his entire life in the home of [C.D. and A.D.] along with his two half-sibling sisters. Such a significant emotional tie exists given the length of time the child has been in the home of [C.D. and A.D.] and severing that tie would not serve the best interests of the child. [C.D. and A.D.]'s home is fit and acceptable and they have all they need to properly care for the child and meet all of the child's needs."

(Emphasis added.) Having determined that the father had voluntarily forfeited his right to custody of the child, the juvenile court, applying the standard from Ex parte McLendon, 455 So. 2d 863, 865 (Ala. 1984),

"determined that no material change in circumstances ha[d] occurred since the last custody order and that there was insufficient evidence to support a conclusion that a change in custody would materially promote the best interest and welfare of the child so that the positive good brought about by the modification would more than offset the inherently disruptive effect of the change in custody."

Thus, the juvenile court denied the father's request in his petition for an award of custody of the child.

The father appealed, and this court, in a per curiam opinion, reversed the juvenile court's judgment, holding that the trial court had erred in applying the Ex parte McLendon standard rather than the "parental-presumption" standard set forth in Ex parte Terry, 494 So. 2d 628 (Ala. 1986). B.F., ___ So. 3d at ___. According to Ex parte Terry, a

7

natural parent holds a prima facie right to the custody of his or her child, which right can be overcome "'only by a finding, supported by competent evidence, that the parent seeking custody is guilty of … misconduct or neglect to a degree which renders that parent an unfit and improper person to be entrusted with the care and upbringing of the child in question.'" 494 So. 2d at 632 (quoting Ex parte Mathews, 428 So. 2d 58, 59 (Ala. 1983)) (emphasis omitted). However, as this court noted, there are two exceptions to Ex parte Terry's parental presumption: (1) when the parent has voluntarily forfeited custody of the child or (2) when a prior judgment has removed custody of the child from the parent and awarded custody to a nonparent. Id. (citing Ex parte McLendon, 455 So. 2d at 865). If one of those exceptions is proven, the parental-presumption standard is replaced by the Ex parte McLendon standard, pursuant to which a parent will not be able to reclaim custody of his or her child unless he or she proves: (1) a material change in circumstances since the entry of the prior custody order, (2) that a change in the child's custody will materially promote the child's best interest, and (3) that the positive good brought about by the change in custody will more than offset the inherently disruptive effect caused by uprooting the child. Id. at 865-66.

8

Relying on our supreme court's decisions in <u>Ex parte D.J.</u>, 645 So. 2d 303 (Ala. 1994), and <u>Ex parte G.C.</u>, 924 So. 2d 651 (Ala. 2005), we held that the father had not acquired any right to custody of the child until the juvenile court had adjudicated him to be the child's father in its June 7, 2024, order. <u>B.F.</u>, ___ So. 3d at ___. Thus, we held that, before that time, he could not have voluntarily forfeited his right to custody of the child. <u>Id.</u> at ___. We also concluded that, because the father had no custodial rights to the child at the time of the entry of the 2021 dependency judgment, that judgment could not be considered a prior judgment removing custody of the child from him. <u>Id.</u> at ___. Therefore, we held that neither of the exceptions to <u>Ex parte Terry</u>'s parental-presumption standard applied, and we concluded that the juvenile court had erred in applying the <u>Ex parte McLendon</u> standard rather than the parental-presumption standard in resolving the father's claim for custody of the child. <u>Id.</u> at ___.

Presiding Judge Moore, joined by all the other members of this court, filed an opinion concurring specially in the per curiam opinion. <u>Id.</u> at ___ (Moore, P.J., concurring specially). In his special writing, Presiding Judge Moore acknowledged that we were bound by the supreme court's

decisions in Ex parte D.J. and Ex parte G.C., and, thus, that we were bound to conclude that the juvenile court had applied the wrong standard in resolving the father's custody claim. Id. at ___ (Moore, P.J., concurring specially). However, he urged the supreme court to overrule those decisions in such a manner that would allow a trial court, in determining whether a father had voluntarily forfeited his custodial rights to his child, to consider the actions or inactions of that father before a formal paternity adjudication. Id. at ___ (Moore, P.J., concurring specially).

C.D. filed a petition for a writ of certiorari with the supreme court, which granted that petition and reversed this court's judgment. Ex parte C.D., ___ So. 3d at ___. In so doing, the supreme court agreed that this court had properly concluded that it was bound by its holdings in Ex parte D.J. and Ex parte G.C. Id. at ___. But, adopting the view of the members of this court as expressed in Presiding Judge Moore's special writing, it overruled those cases, writing:

> "Accordingly, we now state a new standard regarding the period that a court may consider in determining whether a putative father has voluntarily forfeited his presumptive right to a child born out of wedlock. The relevant period begins when 'a putative father knows, or should know, of his paternity of a child born out of wedlock.' B.F. [v. C.D.], [Ms. CL-2025-0032, Aug. 22, 2025] ___ So. 3d [___,] ___ [(Ala. Civ. App. 2025)] (Moore, P.J., concurring specially). We overrule

10

> Ex parte D.J.[, 645 So. 2d 303 (Ala. 1994),] and Ex parte G.C.[, 924 So. 2d 651 (Ala. 2005),] insofar as those decisions conflict with the standard that we state today."

Id. at ___. The supreme court remanded the case to this court for proceedings consistent with its opinion.

Analysis

In applying the new standard that the supreme court announced, our task is to determine whether the evidence supported the juvenile court's conclusion that the father had forfeited his presumptive right to custody of the child because of his actions and inaction beginning when the father knew or should have known that he was the child's father. As set forth above, the juvenile court found that the father knew that the mother was pregnant; that they had been engaged in a sexual relationship at or around the time of conception; that, after the child was born, the mother sent him pictures of the child; that he met and saw the child when the child was a couple of days old; that he bought the mother formula for the child; and that the child's mother sent messages and pictures of the child to the father's mother after the child was born. From our review of the record, we conclude that the testimony at the final hearing supports those findings and that those findings support the trial

11

court's determination that the father knew or should have known, around the time of the child's birth, that the child was his child[1] and that, by failing to avail himself of his rights as the child's father, he voluntarily forfeited those rights.

As noted above, when a natural parent who seeks custody of his or her child is found to have previously voluntarily forfeited his or her prima facie right to custody of the child, Ex parte Terry's presumption in favor of the parent over a nonparent in custody-modification proceedings is replaced by the standard set forth in Ex parte McLendon, which affords the parent no such presumption. See Ex parte McLendon, 455 So. 2d at 865-66. Based on the juvenile court's finding, which was supported by the record, that the father forfeited his rights to custody of his child by failing to act on those rights when he became aware or should have become aware that he was the child's natural father, we conclude that the

---

[1]We note that there was additional evidence that would support the juvenile court's determination that the father knew or should have known that he was the father of the child around the time of the child's birth, including the father's testimony that the mother told him during her pregnancy that he was the father of the child, his testimony that he was "giddy" when he found out about the child, the mother's testimony that the father knew the child was his when he brought her formula, and C.D.'s testimony that, at the time of the dependency hearing in 2021, the mother had been adamant that the father was the child's father.

12

juvenile court properly applied the Ex parte McLendon standard, rather than the Ex parte Terry parental-presumption standard, in resolving the father's custody claim.

To be sure, as the father argues on appeal, some of the testimony supports his position that he did not know that the child was his until the results of the genetic testing proved that he was. For example, the father testified that two other men told him while he was in jail that the mother had told them that the child was theirs; he further testified that he had been uncertain the child was his until the genetic testing confirmed he was the child's father. Moreover, the paternal grandmother testified that the father had told her that he did not believe that the child was his, and testimony indicated that the mother did not have the father's name placed on the child's birth certificate. In addition, the mother's testimony was conflicting regarding the point at which she had come to believe the father was the child's natural father. At times, she testified that she had not been certain that the father was the child's father; at other times, however, she testified that she knew the child was the father's at the time the child was born.

The juvenile-court judge, as the judge of the credibility of the testimony presented to him, was free to accept the testimony he believed and to reject whatever testimony he determined was not credible. See Woods v. Woods, 653 So. 2d 312, 314 (Ala. Civ. App. 1994) ("In ore tenus proceedings, the trial court is the sole judge of the facts and of the credibility of witnesses, and the trial court should accept only that testimony it considers to be worthy of belief."). "When evidence in a child custody case has been presented ore tenus to the trial court, that court's findings of fact based on that evidence are presumed to be correct." Ex parte Bryowsky, 676 So. 2d 1322, 1324 (Ala. 1996). "Appellate courts do not sit in judgment of disputed evidence that was presented ore tenus before the trial court in a custody hearing." Id.

Here, because the testimony was disputed, the juvenile court was tasked with sorting through the testimony, accepting the testimony it found to be credible, and drawing its legal conclusions from that credible testimony. As noted above, our review of the record convinces us that the findings the juvenile court made were supported by testimony and that its determinations based on those findings were legally sound. Because the juvenile court applied the correct standard in resolving the father's

custody claim and the father asserted no other argument on appeal, the juvenile court's judgment is due to be affirmed.

Conclusion

The juvenile court properly applied the Ex parte McLendon standard in resolving the father's claim for custody of the child. Thus, we conclude that the juvenile court's judgment is due to be affirmed.

AFFIRMED.

All the judges concur.